STATE OF CONNECTICUT *v.*
JOHNNY JOE MARTINEZ
(AC 16941)

Foti, Lavery and Daly, Js.

Argued June 2—officially released August 11, 1998

---

*John E. Doran*, special public defender, for the appellant (defendant).

*Peter A. McShane*, assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, and *Courtney Hewes*, certified legal intern, for the appellee (state).

*Opinion*

FOTI, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and assault in the second degree in violation of General Statutes § 53a-60 (a) (2).[1] The trial court sentenced the defendant to an effective term of imprisonment of eighteen years, suspended after twelve years, followed by a five year probationary period. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress evidence seized during a search of his apartment and (2) instructed the jury on the law of self-defense. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early morning hours of December 2, 1995,

---

[1] The jury acquitted the defendant of assault of a victim sixty or older in the third degree in violation of General Statutes § 53a-61a.

the defendant and his wife, Sharymar Martinez, were at the Cheerio Tavern in Norwich. While they were there, Martinez' nephews, Darren Hazzard and Daryl Hazzard, arrived at the bar. A short time later, the defendant and Martinez got into an altercation, after which Martinez became upset and began to cry. In response to seeing Martinez upset, the Hazzard brothers approached her and the defendant. When Darren Hazzard questioned the defendant's behavior, the defendant swore at him, telling him that it was none of his business. Following that exchange, the defendant left the bar and walked to his home a few blocks away. After the defendant left the bar, Carol Vars, an employee there who had witnessed the incident, sat with Martinez for approximately fifteen to twenty minutes and then offered to drive her home.

Vars drove Martinez and both Hazzard brothers to Martinez' apartment, where both the defendant and Martinez resided. Darren Hazzard testified that he and his brother accompanied Martinez to her apartment because "she was upset." When they arrived, the defendant was standing on the sidewalk in front of the apartment. Darren Hazzard then exited Vars' vehicle and crossed the street toward the defendant. As he reached the sidewalk, the defendant struck him in the head with a baseball bat, knocking him unconscious. Upon witnessing his brother being hit, Daryl Hazzard crossed the street "to see what happened." As Daryl Hazzard was checking on his brother, he, too, was struck in the head with the baseball bat by the defendant. During this time, Martinez, who had also crossed the street, was pushed to the ground by the defendant.

A short time later, Robert Smith, a Norwich police officer, arrived. He found both Hazzard brothers, as well as Martinez, in need of medical attention and called three ambulances. Smith then spoke to the defendant who stated, "I fucked him up with my hands. I did not

use a baseball bat. I'm a martial artist." The defendant was then arrested. While Smith was transporting the defendant to police headquarters, the defendant told him, "If you don't have a bat, you can't prove anything." The police searched the area outside the defendant's apartment for the baseball bat, but it was not found.

I

The defendant first claims that the trial court improperly denied his motion to suppress evidence seized during a search of his apartment. Specifically, the defendant claims that the police did not obtain voluntary consent from Martinez prior to their search of his apartment.[2] We disagree.

The following additional facts, which were adduced at the suppression hearing, are necessary to our resolution of this claim. A short time after the incident, at approximately 3 a.m., Martinez went to police headquarters to give a statement about what had occurred. After giving her statement, she was driven home by a Norwich police officer. Then, at around 5 a.m., a Norwich police officer observed Martinez walking on the side of the street outside her apartment. The officer thought that she appeared upset and took her to William W. Backus Hospital in Norwich, where she was examined and discharged shortly thereafter. Martinez then returned home.

At 6:30 a.m., Sergeant Raymond Chabotte and Investigator Todd Maikshilo, both of the Norwich police department, returned to Martinez' apartment to search for the baseball bat. Although Chabotte had gone to the Martinez apartment following the original incident, Maikshilo had not, and he was unaware of the specific circumstances surrounding that morning's events.

---

[2] There was no claim by the defendant that Martinez, with whom he shared the Central Avenue apartment, lacked standing to consent to the search of the apartment.

Upon arriving, Chabotte and Maikshilo were greeted by Martinez, who invited them into her apartment. Although Maikshilo was not dressed in uniform, he identified himself as an investigator with the Norwich police department.

Once inside, Chabotte and Maikshilo explained to Martinez that they were there to obtain her consent to search her apartment, specifically to find the weapon that had been used earlier in the morning. Martinez was presented with a consent form, which Maikshilo read to her "line by line," and was told that she had the right to refuse to consent to a search. Martinez then reviewed the consent form and signed it. At no time prior to signing did Martinez ask questions about the consent form or indicate that she had any difficulty understanding its contents.

Chabotte testified at the suppression hearing that although Martinez appeared upset over what had happened earlier that morning, she was very cooperative and asked several times how her nephews were doing. In addition, he testified that Martinez appeared to understand what was going on even though he was aware that she probably "had been awake all night long." Chabotte also testified that while he knew that Martinez had been drinking earlier that morning at the Cheerio Tavern, by the time she signed the consent form at around 6:30 a.m., she appeared sober. In addition, at no time during the search did Martinez block Chabotte's or Maikshilo's access to any room or otherwise attempt to limit the scope of their search. During the search, Chabotte found a baseball bat behind some cardboard boxes in the pantry. It was photographed and seized as evidence.

It is axiomatic that " 'searches and seizures inside a home without a warrant are presumptively unreasonable.' *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Guertin*, 190 Conn.

440, 446, 461 A.2d 963 (1983). A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with authority to do so has freely consented. *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988)." *State* v. *MacNeil*, 28 Conn. App. 508, 513, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). "The question of whether a defendant has given voluntary consent to enter or search his or her premises is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the entry or search. *State* v. *Ortiz*, 17 Conn. App. 102, 103, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988)." *State* v. *Vargas*, 34 Conn. App. 492, 496, 642 A.2d 47, cert. denied, 230 Conn. 907, 644 A.2d 921 (1994).

"The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with the reasonable inferences that can be drawn therefrom. *State* v. *Reddick*, 189 Conn. 461, 469, 456 A.2d 1191 (1983)." *State* v. *Ortiz*, supra, 17 Conn. App. 103–104. "Whether there was valid consent to search is a factual question that will not be lightly overturned on appeal. *United States* v. *Sanchez-Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.), cert. denied, 449 U.S. 862, 101 S. Ct. 166, 66 L. Ed 2d 79 (1980)." *State* v. *Zarick*, 227 Conn. 207, 226, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993). "The ultimate question 'is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice.' *State* v. *Cobbs*, 7 Conn. App. 656, 659, 510 A.2d 213 (1986)." *State* v. *MacNeil*, supra, 28 Conn. App. 514.

In this case, the trial court made specific findings regarding Martinez' consent to search. In its memorandum of decision on the defendant's motion to suppress,

the trial court found that while there was evidence that Martinez had been drinking alcohol earlier in the evening, there was no evidence presented as to how much she had consumed. In addition, there was no evidence of any lingering effects of the alcohol at 6:30 a.m. when the police obtained Martinez' consent. While the trial court found evidence that Martinez had gotten little sleep on the morning of December 2, 1995, there was nothing in the record that indicated any impairment of her mental faculties. Further, the court found that although Martinez was taken to Backus Hospital by a Norwich police officer sometime following the incident because she "was not acting right," it noted that she was discharged shortly thereafter.

Additionally, Martinez appeared to follow what was going on and her responses to Chabotte and Maikshilo were not inappropriate. Although Martinez was scared and upset, the court found that her emotional state was due to her concern for the condition of her nephews. Further, Martinez had taken the consent form from Chabotte and Maikshilo and appeared to read it. At no time did she indicate that she had any difficulty reading or understanding the contents of the consent form. The court noted that Maikshilo read the consent form to Martinez. Finally, the trial court credited the testimony of Chabotte and Maikshilo, both of whom testified that it was their opinion that Martinez fully understood their request and consented to the search of the premises. On the basis of these factors, the trial court found that under the totality of the circumstances, Martinez had voluntarily consented to the search.

Notwithstanding the court's finding, the defendant asserts that Martinez' consent was not voluntary and points to the fact that during their conversation Maikshilo told Martinez that if she did not want to sign the consent form, "a search warrant would be applied for." The defendant cites *Dotson* v. *Warden*, 175 Conn. 614,

621, 402 A.2d 790 (1978), for the proposition that "the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." In *Dotson*, the court found that the representation by police that they could get a warrant, which might be "embarrassing" to the owner of the home, was improper. Id. In *Dotson*, the court faulted the police for failing to convey to the owner "that the issuance of a search warrant involves the exercise of discretion and judicial power, and is not a mere ministerial act." Id.

Here, however, Maikshilo's statement that he would "*apply* for a warrant" is not inherently coercive. At no time did Maikshilo imply that a search warrant for the Martinez home would or could automatically issue, or that Martinez' refusal to consent to the search would be futile. In fact, Martinez was informed specifically by both Chabotte and Maikshilo that she had the right to refuse consent. The consent form itself, which was read and signed by Martinez, also informed her of her right to refuse consent. Maikshilo's statement, when viewed as one factor in the totality of the circumstances, was not sufficient to render Martinez' consent involuntary.

While it is true that Martinez testified at the suppression hearing and claimed that she never consented to the search and that she didn't know what she was signing, the trial court chose not to credit her testimony. " 'This court does not retry the case or evaluate the credibility of the witnesses.' *State* v. *Amarillo*, [198 Conn. 285, 289, 503 A.2d 146 (1986)]." *State* v. *Taylor*, 23 Conn. App. 426, 429, 580 A.2d 1004 (1990). "Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . *State* v. *Mejia*, [233 Conn. 215, 224, 658 A.2d 571 (1995)]." (Internal quotation marks omitted.) *State* v. *McClam*, 44 Conn. App. 198, 208, 689 A.2d 475, cert.

denied, 240 Conn. 912, 690 A.2d 400 (1997). In its memorandum of decision, the trial court expressed "real doubts" about Martinez' credibility. The court found that "her recollection of events was questionable and perhaps colored." This court will not second-guess the trial court's findings.

On the basis of these facts, the trial court's finding that under the totality of the circumstances, Martinez voluntarily consented to a search of her home was not clearly erroneous. It therefore properly denied the defendant's motion to suppress.

## II

The defendant next claims that the trial court improperly instructed the jury on self-defense.[3] Specifically,

---

[3] The trial court's instruction on self-defense stated in relevant part: "Therefore, on self-defense, our statute says, use of physical force in the defense of person, that's the title of the statute. A person is justified in using reasonable physical force upon another person to defend himself from what he reasonably believes to be the use of or imminent use of force. And he may use such degree of force which he reasonably believes to be necessary for such person, except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or [is] about to use deadly physical force or inflicting or [is] about to inflict great bodily harm.

"In this case, you may consider and determine whether there was the use of deadly physical force by the defendant. If you determine that the force he used was deadly physical force, I'm going to consider again what I have just said. Deadly physical force may not be used unless the actor, that is the defendant, reasonably believes that such other person, that is either Daryl or Darren, was using or was about to use deadly physical force or about to inflict or was inflicting great bodily harm on the defendant. Deadly physical force means physical force that can reasonably be expected to cause death or serious physical injury. Serious physical injury means injury that creates a substantial risk of death or that causes serious disfigurement, serious impairment of health or serious loss or impairment of a bodily function. Great bodily harm is not limited by the definition of serious physical injury and may encompass other acts of the victim. The term has its ordinary meaning and connotes a bodily harm that is substantially more than minor or inconsequential harm.

\* \* \*

"Now, in self-defense, the focus is on the defendant, the person claiming self-defense. The focus is on what he reasonably believed under the circum-

the defendant argues that the court's instruction failed to give the jury the option of applying the subjective-objective test to the defendant's use of nondeadly force. We disagree.

"It is a fundamental element of due process that a defendant charged with the commission of a crime be permitted to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)." *State* v. *Scarpiello*, 40 Conn. App. 189, 204, 670 A.2d 856, cert. denied, 236 Conn. 921, 674 A.2d 1327 (1996). "This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified." (Internal quotation marks

---

stances and presents a question of fact for you, the jury. In other words, what's important is what the defendant reasonably believed under the circumstances. The test for the degree of force in self-defense is a subjective/objective test, meaning it has some subjective aspects and some objective aspects. Self-defense thus requires the jury to measure the justifiability of the defendant's action from a subjective perspective, that is what the defendant reasonably believed under the circumstances presented in this case, and on the basis of that and on the basis of what the defendant perceived those circumstances to be.

"The statute, however, requires that the defendant's belief must have been reasonable, and not irrational or unreasonable or be unreasonable under the circumstances. That is, would a reasonable person in the defendant's circumstances have reached that belief? That's the objective aspect . . . of the case. It is both the question of what his belief was and whether that belief was reasonable. Now, considering that objective tests are, once— whether whatever belief the defendant had come to in determining whether it was a reasonable belief for him to come to under all the circumstances, the test is what a reasonable person would come to, what conclusion would come to. Intoxication is not a factor there.

\* \* \*

"Therefore, if you find proof beyond a reasonable doubt that neither Daryl nor Darren was about to use deadly physical force or inflict great bodily harm upon the defendant, and if you further find proof beyond a reasonable doubt that the defendant had no reasonable belief that the victim was using or about to use deadly physical force or inflict great bodily harm upon the defendant, then the defendant would not be justified in using deadly physical force upon either Daryl and/or Darren."

omitted.) *State* v. *Anderson,* 227 Conn. 518, 526, 631 A.2d 1149 (1993). "The standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. *State* v. *Hall,* 213 Conn. 579, 587, 569 A.2d 534 (1990); *State* v. *Corchado,* [188 Conn. 653, 660, 453 A.2d 427 (1982)]." *State* v. *Anderson,* supra, 526–27.

When reviewing such a charge, however, it is clear that it "is to be read as a whole and that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Suggs,* 209 Conn. 733, 755, 553 A.2d 1110 (1989); *State* v. *Washington,* 15 Conn. App. 704, 713, 546 A.2d 911 (1988)." *State* v. *Miller,* 36 Conn. App. 506, 511, 651 A.2d 1318, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995). "The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Prioleau,* 235 Conn. 274, 284, 664 A.2d 743 (1995).

In general, "[t]he Connecticut test for the degree of force in self-defense is a subjective-objective one." *State* v. *DeJesus,* 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984). The crux of the defendant's argument is that the court's initial instruction on self-defense "linked" this "subjective-objective standard exclusively to deadly physical force." He claims that this "removed from the jury's consideration the subjective-objective standard as applied to 'nondeadly' physical force under [General Statutes] § 53a-19 (a)." This was important, according to the defendant, because "whether the defendant used physical force or deadly physical force was clearly an issue" before the jury. The defendant argues that "the court's instruction diluted the state's burden of disproving self-defense beyond a reasonable doubt."

What the defendant overlooks, however, is that the trial court gave the jury a curative instruction at the request of the defendant.[4] In that instruction, the court essentially recharged the jury on the appropriate subjective-objective standard and, in doing so, made no mention of deadly physical force as it applied to the defendant's case. Therefore, to the extent that the court's initial instruction may have linked the subjective-objective standard exclusively to deadly physical force, the court's subsequent instruction stated correctly the subjective-objective test as it applies to all uses of force. As such, the instruction, as a whole, enabled the jury properly to apply the subjective-objective standard to the defendant's actions, even if it determined that the defendant had, in fact, used nondeadly physical force.

---

[4] The trial court's curative instruction on self-defense stated in relevant part: "Finally, in talking to you about self-defense . . . there's a subjective aspect and also an objective aspect. And the first part, the subjective, is: What was the person who perceives himself in need of exerting self-defense, what's going on in his mind subjectively? And, what did he, the person in this case, the defendant, what did he perceive as the danger or apparent danger? And that is to be determined from the defendant's standpoint. At the time of the events and under all the circumstances then existing. What led to the defendant's belief, if he had one, that he needed to defend himself, need not be an actual threat or an assault. The test is not what the other persons, Daryl and/or Darren, intended, but what their actions were, words or conduct or gestures caused the defendant to believe. In other words, there need not have been actual danger to the defendant, but the defendant— if he reasonably believed that the danger was actual, real, imminent or unavoidable—so the focus is on what the defendant perceived and believed in the first instance.

"And then, we get the objective aspects of that as well. He may have believed that, but was it reasonable under the circumstances? That's the objective standpoint. Now, in judging the defendant and trying to determine whether or not the defendant's belief was proper under the circumstances, we don't require a defendant or a person in such circumstances to act with infallible judgment. Because ordinarily, a person in a position where self-defense is deemed necessary is required to act instantly without the time to deliberate or investigate. And thus, under such circumstances, it's often possible for a person to misperceive what's actually going on. So, you judge first whether he, in fact, had a belief that he was in danger, such danger

In addition to stating the subjective-objective test properly, the court also took steps to de-emphasize its earlier remarks on deadly physical force. Prior to the court's curative instruction, defense counsel had objected to the court's references to deadly physical force. When asked how to cure the problem, defense counsel suggested: "Well, certainly there's the standard verbiage to the effect to the degree which I appear to have mentioned something more than once or mentioned it or putting it first or put it last—or . . . that I did not intend to put greater emphasis on that than any other portion of my charge. I would suggest that . . . ."

In response, the court explained to the jury: "Also, in my instructions, there may have been parts that I repeated on more than one occasion. That was not meant to mean that that instruction or those instructions that I repeated were more important than some others. It just means that as I was speaking to you, the thought of this point came out and I perhaps lost awareness that I had already told you about." Therefore, in addition to instructing the jury properly on the correct subjective-objective test, the court attempted to remedy any prejudicial effect that its previous references to deadly physical force may have had on the jury.

Our review of the charge leads us to conclude that there is no reasonable possibility that the jury was misled. When we view the instruction as a whole, it appears that the trial court correctly charged the jury on the subjective-objective standard as it applied to the defendant's use of force.

The judgment is affirmed.

In this opinion the other judges concurred.

that he was required to act in self-defense. But then step back and look at all the circumstances, and would a reasonable person in such circumstances think he was in such danger?"