# STATE OF CONNECTICUT *v.* STEVEN CLARK
## (AC 22677)

West, DiPentima and McLachlan, Js.

Argued September 18—officially released November 18, 2003

*Auden Grogins*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Paul E. Murray*, former state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Steven Clark, appeals from the judgment of conviction, rendered after a jury trial, of one count of interfering with an officer in violation of General Statutes § 53a-167a, one count of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (1), one count of possession of narcotics in violation of General Statutes § 21a-279 (b), one count of possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), one count of operation of a drug factory in violation of General Statutes § 21a-277 (c) and one count of criminal mischief in the second degree in violation of General Statutes § 53a-116 (a) (1).

The defendant's sole claim on appeal is that the court improperly denied his motion to suppress evidence seized from his residence as "fruit of the poisonous tree" because it was obtained as a result of an allegedly unlawful search. Specifically, the defendant claims that his consent to the search was not voluntary, but was obtained under police coercion. We affirm the judgment of the trial court.

The court reasonably could have found the following facts. On April 6, 2000, Scott Kupis, an investigator with the department of children and families, was informed by the statewide narcotics task force that Brenda Gresko, the mother of two minor children, then age seven and two, had been arrested on drug charges. In view of Gresko's arrest, Kupis was requested to check

on the well-being of the two minor children who, following the arrest of their mother, had reportedly been taken to the home of the defendant's mother, where the defendant also resided. The defendant is the biological father of the two year old, but has no biological or legal custodial relationship with the seven year old.

The check on the children required Kupis to visit them at the defendant's residence to assure their safety and the appropriateness of their environment. Due to a previous incident with the defendant in which the defendant exhibited belligerent behavior, Kupis decided to have a police officer accompany him to the defendant's residence. After stopping at the Coventry police department to pick up Officer Christopher Fiore, Kupis proceeded to the defendant's residence. Upon arrival, Kupis and Fiore observed the defendant standing outside of the home on its deck. Kupis, who stood in the driveway with Fiore, explained to the defendant the purpose of his visit. During the conversation, Kupis observed through a window a young child, whom he believed to be the two year old, inside the house. At several points during the conversation, the defendant went inside the house, claiming that he "had to go inside and check on his two and seven year old." Kupis asked the defendant if he could see the two year old to ascertain his well-being. The defendant agreed, retrieved the child from the house and brought him outside where Kupis could see him. After ascertaining that the two year old was all right, Kupis asked the defendant if the seven year old could also be brought outside. The defendant stated that the seven year old was not in the house, but had been taken to school earlier that morning. The defendant then informed Kupis and Fiore that the seven year old to whom he had earlier referred was not Gresko's child, but was the cousin of the two year old. In an attempt to corroborate the defendant's explanation as to the whereabouts of Gresko's seven

year old, Kupis telephoned the child's elementary school and was told by school officials that he was not there.

A second police officer from the Coventry police department, Lieutenant Nancy Gillon, arrived at the defendant's residence. Gillon stayed in the driveway with Kupis and Fiore while the defendant continued to remain on the deck. At approximately that time, the defendant's mother arrived at the residence. She denied taking Gresko's seven year old to school that morning and indicated that she believed he was still inside the house. The defendant then admitted to Kupis, Fiore and Gillon that he had lied about another child being in the house and that in fact, no seven year old, not even the cousin, was inside. The defendant then agreed to permit Kupis, Fiore and Gillon to enter the residence and to search for Gresko's seven year old.

Kupis, Fiore and Gillon each testified at trial as to the circumstances surrounding the defendant's consent to the search. Gillon testified that before she, Kupis and Fiore entered the house, the defendant first went inside, allegedly to secure his dogs. Gillon testified that when the defendant returned, he stated that he had "secured the dogs, and it was safe for us to now go in the house and look for [the child]." Gillon further testified that the defendant stated that "there [is] no seven year old in the house. . . . I lied about all that, made it up, and you guys are free to come in and look around . . . ."

Kupis testified similarly that the defendant first went into the house to purportedly secure his dogs and then stated "that we could come in and check the home, to feel free to check around the home to see if [the seven year old] was there." Fiore consistently testified that after the defendant admitted to lying about the presence of a seven year old, the defendant indicated that he

needed to go in the house to relocate his dogs so that Fiore, Kupis and Gillon "could go in the house without being attacked by the dogs." Fiore further testified that after the defendant purportedly had secured the dogs, he returned and said "[s]omething to the effect of, 'Fine; go ahead. You can look for him.' " At that point, Kupis, Fiore and Gillon entered the home through the front door, accompanied by the defendant.

Once inside the house, Kupis, Fiore and Gillon began searching for the seven year old. As they searched, the defendant made various comments such as, "maybe you should look in the fireplace; maybe he's hiding in the chimney." At one point, the defendant commented that "he might be hiding in the attic" and proceeded to pull the attic stairwell down for Gillon to climb. As the officers searched, the defendant continued walking around, calling the child's name, making comments such as, "Oh, maybe you should check in the fireplace. Maybe he's hiding in the chimney. Maybe you should check here; check there." The defendant stated that "[y]ou're free to come look, there's no kid here," and then proceeded to call the child's name, telling him to come out.

During a search of one of the rooms, Fiore observed a bag containing a substance he believed to be marijuana. Subsequently, Gillon came upon the defendant's bedroom where she detected the strong odor of marijuana and observed live marijuana plants growing. On the basis of their plain view observations, the officers applied for and obtained a search warrant for the house. Upon executing the search warrant, officers discovered a large number of live marijuana plants in various stages of maturity, large garbage bags full of marijuana, various fertilizers, growing mediums, growing lights and fixtures, potting soil, seeds, packing materials, a bag sealing machine, a triple beam scale, bowls, bongs, rolling papers and a shotgun.

In a six count amended information, the defendant was charged with interfering with an officer, assault of public safety personnel, possession of narcotics, possession of narcotics with intent to sell, operation of a drug factory and criminal mischief in the second degree. At trial, the defendant filed a motion to suppress the items seized from his residence,[1] asserting that the search had been conducted without a warrant and without his voluntary consent, and, therefore, that anything seized was the tainted fruit of an illegal search and seizure.[2] The court denied the motion and, on October 4, 2001, the jury returned a guilty verdict on all six counts. On November 29, 2001, the court imposed a total effective sentence of six years incarceration, followed by two years special parole. The defendant now appeals from the judgment of conviction on the ground that the court improperly denied his motion to suppress.

It has long been recognized that searches and seizures inside a home without a warrant are presumptively unreasonable. See *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). It is also recognized, however, that "[a] search . . . is not unreasonable under . . . the fourth amendment to the constitution of the United States . . . if a person with authority to do so has freely consented . . . . *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Zarick*, 227 Conn. 207, 226, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993). "When the entry is justified on the basis of consent, the state has the

---

[1] The motion also sought to suppress certain admissions made by the defendant during the search of his residence.

[2] Our Supreme Court has explained that "the fruit of the poisonous tree doctrine . . . requires courts to exclude evidence that is the product or fruit of police conduct in violation of the fourth amendment." (Internal quotation marks omitted.) *State* v. *Ostroski*, 201 Conn. 534, 545, 518 A.2d 915 (1986).

additional burden of showing that the consent was voluntarily given. . . . To be voluntary, consent must be the free and unconstrained choice . . . of the one giving it, and it cannot be obtained by duress or coercion, express or implied." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 13 Conn. App. 139, 147, 535 A.2d 371 (1987). "The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with the reasonable inferences that can be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Martinez*, 49 Conn. App. 738, 743, 718 A.2d 22, cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998). "Whether there was valid consent to a search is a factual question that will not be lightly overturned on appeal." *State* v. *Zarick*, supra, 226. The conclusions of the court will stand on appeal unless they are clearly erroneous. *State* v. *Ortiz*, 17 Conn. App. 102, 104, 550 A.2d 22, cert. denied, 209 Conn. 828, 552 A.2d 1216 (1988).

The court's finding that the defendant voluntarily consented to the search is amply supported by the record. The testimony of three credible witnesses establishes that the defendant's consent was free from coercive influence by the police. Kupis, Fiore and Gillon all testified that they remained in the driveway of the house while conversing with the defendant, who was situated on the deck at all relevant times. There is no evidence that the officers removed the defendant from the deck or attempted to confront him on the deck. See *United States* v. *Erwin*, 155 F.3d 818, 823 (6th Cir. 1998), cert. denied, 525 U.S. 1123, 119 S. Ct. 906, 142 L. Ed. 2d 904 (1999). The record is devoid of any evidence that the officers drew their weapons or touched the defendant in a threatening way. See id. Furthermore, the police did not enter the defendant's home and roust him out of bed in the night; cf. *Harless* v. *Turner*, 456 F.2d 1337, 1338 (10th Cir. 1972); or break down his door; cf. *United*

*States* v. *Mapp*, 476 F.2d 67, 77–78 (2d Cir. 1973); or use threatening language or tone in their conversations with him. Cf. *Ex parte Tucker*, 667 So. 2d 1339, 1344 (Ala.), cert. denied, 516 U.S. 944, 116 S. Ct. 382, 133 L. Ed. 2d 305 (1995). The record also does not reflect that there was an overwhelming police presence at the defendant's home. Cf. *United States* v. *Mapp*, supra, 78 (noting presence of five or six officers in finding consent not voluntary); see also *Ex parte Tucker*, supra, 1344 (finding that otherwise coercive environment magnified by presence of five uniformed police officers). In short, the record reveals nothing coercive about the manner in which the police encountered or interacted with the defendant and that the defendant could have, at any time, refused to consent to the search.

Moreover, the defendant, through his words, acts and conduct, demonstrated that his consent was given freely. See *United States* v. *Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (stating that voluntariness of consent can be found in words, acts or conduct of defendant). The defendant invited Kupis, Fiore and Gillon into his home through the front door after reassuring them he had secured his dogs and that they could search for the child safely. Once the officers were inside the home and actively searching for the child, the defendant walked around the house making numerous remarks about locations where he might be hiding and sarcastically calling out to the child to come out from where he was hiding. The defendant pulled down the attic stairs for Gillon and suggested that the child could be hiding in the attic. The defendant's remarks to the police and his conduct throughout the search do not indicate that he was under any coercive influence and, to the contrary, support the conclusion that his consent was voluntary.

The defendant appears to predicate his claim of coercion on the mere presence of police officers at his home. Beyond his bare assertion that "[the police] were

showing—[making a] show of force at my front door"; however, the defendant has failed to detail any specific behavior by the officers that corroborates his contention. In contrast, our review of the record reveals that the officers did not engage in any coercive measures or otherwise create an environment of duress sufficient to vitiate the defendant's voluntary consent. To the extent that the defendant asks us to hold that the mere presence of two police officers at this home is inherently coercive so as to vitiate consent, we specifically decline to do so. That the defendant believed he had no choice but to let Kupis, Fiore and Gillon enter his home to search for the child is not itself demonstrative of coercive influence by the police, but a result of the defendant's having ensnared himself in a series of lies regarding the child's whereabouts.

We find that the testimony adduced at the hearing on the motion to suppress more than adequately supported the court's determination that the defendant voluntarily consented to the search. We accordingly conclude that the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.