STATE OF CONNECTICUT *v.* ROBERT MULLIEN III
(AC 33490)

Beach, Sheldon and Borden, Js.

---

Argued October 16, 2012—officially released January 22, 2013

*Kevin C. Connors*, with whom, on the brief, was *Mark C. Hauslaib*, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Edward R. Azzaro* and *Jennifer M. Barry*, assistant state's attorneys, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Robert Mullien III, appeals from the judgment of conviction, rendered after a jury trial, of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and assault in the second degree in violation of General Statutes § 53a-60 (a) (2). On appeal, the defendant claims that the trial court improperly: (1) denied his motion to suppress evidence and a confession obtained during a search of his home; and (2) granted the state's motion to amend the information after the trial had commenced. We affirm the judgment of the trial court.

The state charged the defendant by way of an amended information with one count of risk of injury to a child in violation of § 53-21 (a) (1) and one count of assault in the second degree in violation of § 53a-60 (a) (2). Prior to trial, the defendant filed a motion to suppress certain oral and written statements he had made to detectives as well as the physical evidence seized and obtained after the detectives entered his home. After an evidentiary hearing, the trial court denied the defendant's motion. The jury found the defendant guilty on both counts. The court, after accepting the jury's verdict, sentenced the defendant

to a total effective term of ten years of incarceration, execution suspended after five years, followed by five years of probation. This appeal followed.

The jury reasonably could have found the following facts. In August, 2007, Minnesota child protection authorities contacted the defendant, requesting that he take guardianship of his nephew, P, and two nieces, H and A, because the children could no longer live with their mother, the defendant's sister.[1] On the morning of May 12, 2008, H arrived at her elementary school and approached her teacher to hand in homework. H's teacher saw bruising on her face and, after asking H what happened, H explained that the bruising was caused either when she was hit with a basketball or ran into a basketball pole. After the school nurse examined H, the nurse called the department of children and families' hotline. A department of children and families investigator met with the nurse and H, and determined that the bruises on H did not appear to be accidental and contacted the state police.

When state Trooper Roberto Morales arrived at the school, he interviewed H and her siblings, and took photographs of H and her injuries. After he left the school, Morales went to the defendant's home to interview him and his wife. The defendant agreed to give a written statement in which he claimed that H had struck her face against a basketball pole. The next day, May 13, 2008, Detective Keith Hoyt conducted forensic interviews of H and P at the children's advocacy center in Danielson. On the basis of those interviews, Hoyt proceeded to the defendant's home where he met Detective Erik Costa. The detectives sought to obtain consent

---

[1] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

to search the defendant's home for evidence relating to the physical assault of H.

The defendant and his wife let the detectives into the home and ultimately gave the detectives written consent to search the house. Additionally, after signing a waiver of his *Miranda*[2] rights, the defendant confessed that on several occasions he had struck H with his hand, a belt and a length of rope. The defendant also pointed out a length of rope and a belt on the top of a hutch in the dining room.

At trial, H testified that the defendant caused the bruises on her face when he slapped and punched her, and inflicted bruising to her buttocks and her legs when he struck her with his belt. Additionally, the defendant hit her on the back of the leg with a "whipper," namely, a deer whistle with a chain. The defendant also made H stand in the corner of a room while holding her hands in the air for long periods of time, made her stand outside at night in a wooded area for several hours and made H wear a sign on her back that said, "I'm retarded." H's brother, P, testified that he saw the defendant hit H on her buttocks with his belt while holding her down on the kitchen table and that, to P, it seemed as if the defendant hit H almost every day. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the court improperly denied his motion to suppress evidence obtained during a police search of his home. Specifically, the defendant contends that the court improperly found that he freely and voluntarily consented to the search and that, therefore, the warrantless search of the defendant's home

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, L. Ed. 2d 694 (1966).

violated his constitutional rights. The defendant further claims that the written and oral statements he gave the police were derivative of this unlawful police conduct. We disagree.

The following additional facts, which were adduced at the suppression hearing, are necessary to our resolution of this claim. After Hoyt had been assigned the investigation, he spoke with Morales, the trooper who had obtained a preliminary statement from the defendant. Hoyt then interviewed both H and P, and concluded that H had been physically abused.

At 4:30 p.m., on May 13, 2008, Hoyt and Costa went to the defendant's home in Canterbury to interview the defendant and to obtain consent to search the premises. Upon arriving, Hoyt and Costa were greeted by the defendant and his wife at the door. Although the detectives were not in uniform, they displayed badges and identified themselves as state police officers.[3] The defendant and his wife[4] invited the detectives into the home. Once inside, and seated at the dining room table, Hoyt asked the defendant for consent to search the premises. The defendant initially agreed to consent to the search and "then made reference to possibly calling an attorney and not granting consent to search his premises." The detectives informed the defendant that "in that situation, the state police might seek a search warrant, at which time Detective Hoyt and possibly others would remain on the premises to secure the premises while detectives or other law enforcement officers obtained a warrant." After approximately five to ten minutes, the defendant consented to a search of his home, and Hoyt went through the consent form line by

---

[3] The defendant testified at the suppression hearing that the police officers had identified themselves as being from the "state's attorney's office," but the court concluded that the defendant had been mistaken.

[4] Although the defendant's wife was present at the time of the search, the voluntariness of only the defendant's consent is in issue in this appeal.

line with the defendant, who signed the form. While waiting for the arrival of additional officers to conduct the search, Hoyt informed the defendant that if he wanted to discuss the allegations, Hoyt would need to give him his *Miranda* rights. The defendant signed a notice and waiver of rights form that Hoyt read line by line.

Subsequent to the defendant's signing the waiver of rights form, Hoyt began asking questions regarding the defendant's statement to Morales, and the defendant again denied ever striking H. Hoyt then produced photographs of H's bruises, and the defendant admitted that he had struck H. The defendant himself pointed out certain objects in his home, including a belt and a rope. After speaking with the defendant for approximately two hours, the defendant agreed to sign a written statement. Hoyt wrote the statement out, and the defendant read through it, pointing out corrections to be made to the statement. Hoyt made the corrections, and the defendant initialed the edits and signed the full statement. Throughout the entire time period that the detectives were inside the defendant's home, the defendant and his wife were able to move around freely within the home. The defendant used the bathroom on a couple of occasions, and his wife went outside at some point to either walk the dog or smoke a cigarette, after which Costa joined her outside.

"It is axiomatic that searches and seizures inside a home without a warrant are presumptively unreasonable. . . . A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with authority to do so has freely consented. . . . The question of whether a defendant has given voluntary consent to enter or search his or her premises is a question of fact to be determined by the trial court by considering

the totality of the circumstances surrounding the entry or search. . . .

"The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with reasonable inferences that can be drawn therefrom. . . . Whether there was a valid consent to search is a factual question that will not be lightly overturned on appeal. . . . The ultimate question is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice." (Citations omitted; internal quotation marks omitted.) *State* v. *Martinez*, 49 Conn. App. 738, 742–43, 718 A.2d 22, cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998).

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." (Internal quotation marks omitted.) *State* v. *Janulawicz*, 95 Conn. App. 569, 574, 897 A.2d 689 (2006).

Application of these principles to the facts of this case leads us to conclude that the defendant voluntarily consented to the search of his home. We reach this conclusion by examining the totality of the circumstances. *State* v. *Martinez*, supra, 49 Conn. App. 743. In this case, there was ample evidence from which the court could conclude that the defendant consented freely and voluntarily. Testimony was adduced at the suppression hearing that the defendant and his wife invited the detectives into their home. The detectives informed the defendant of his right to refuse consent and explained the written consent form line by line. At

no time did the defendant or his wife ask Hoyt or any other detective to leave the residence, even though Hoyt explained to the defendant that he had the right not to allow the police to search his home. Although the defendant argues that his account of the police entry into the home significantly differed from the detectives' testimony, "we are mindful, as we must be, that where there is conflicting testimony, it is uniquely the function of the trier of facts to weigh the evidence and assess the credibility of witnesses." *State* v. *MacNeil*, 28 Conn. App. 508, 514, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). On the basis of our review of the record, we conclude that the court's findings were not clearly erroneous, and that its denial of the defendant's motion to suppress was supported by the facts.

The defendant argues nevertheless that Hoyt's statement that they would "apply for a search warrant," coupled with Hoyt's indicating that "he would remain at the table, sitting down at the kitchen table, awaiting a search warrant," was coercive because it made the defendant fear that unless he consented to the search, the detectives would remain indefinitely at his home. The state argues that the court correctly found that "the state trooper detective had, indeed, a right to remain present within the residence once having been invited inside by [the defendant], notwithstanding the possible invocation of a desire by [the defendant] to contact his attorney . . . ." We agree with the state.

While a threat to take an improper action may vitiate voluntariness; *Dotson* v. *Warden*, 175 Conn. 614, 621, 402 A.2d 790 (1978); here, no improper threat was made. If the detectives had informed the defendant that a search warrant would be issued if he had refused to give consent, then such consent would have been involuntary because "the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." Id. In *Dotson,*

the court was concerned with the inherent coerciveness of "the intimation that a warrant will *automatically* issue"; (emphasis added) id.; as opposed to the situation here, where Hoyt informed the defendant that the police "*would apply* for a search warrant." (Emphasis added.) Further, if the defendant refused to allow the search, it would have been proper for the police to secure the premises while awaiting a search warrant. In *State* v. *Brunetti*, 279 Conn. 39, 70–71, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), our Supreme Court held that the defendant's father voluntarily consented to a search of his home where the defendant was living, despite a detective's statement that the police "could obtain a search warrant and possibly keep [him] from going back into [his] home until the search warrant . . . [was] obtained." (Internal quotation marks omitted.) Id., 70. The court in *Brunetti* described the detective's statement as an accurate statement of standard police practice and held that it was neither misleading nor inherently coercive. Id., 71 n.41. In the present case, Hoyt explained to the defendant that Hoyt "needed to stay and make sure nothing was destroyed." Hoyt's statement was not misleading or coercive because the detectives were entitled to apply for a search warrant and lawfully remain on the premises for the purpose of preventing destruction of the evidence while they obtained a search warrant. See *Segura* v. *United States*, 468 U.S. 796, 810, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984) ("securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents"); see also *Illinois* v. *McArthur*, 531 U.S. 326, 331–36, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001) (permitting impoundment of person's home for reasonable periods of time while police obtain search warrant).

To support his argument, the defendant relies on *State* v. *Rushton*, 264 Mont. 248, 259, 870 P.2d 1355 (1994), in which the Montana Supreme Court reversed the district court's denial of the defendant homeowner's motion to suppress evidence of a marijuana growing operation that the police seized during a warrantless search of the defendant's home. In *Rushton*, the court found that the defendant's consent was not voluntary because the defendant already had admitted to the presence of contraband on the premises in response to unlawful questioning, the police implied that if the defendant did not cooperate he would be arrested and the police further misrepresented that they could sit in the defendant's home for a number of hours while a warrant was obtained. Id., 258–59. The defendant in this case argues that his consent, like that of the homeowner in *Rushton*, was not voluntary in light of Hoyt's statement that if he did not give consent, a search warrant would be applied for and that the detectives would likely remain on the premises until the search warrant issue was resolved. The defendant's reliance in *Rushton* is misplaced.

The facts in *Rushton* are readily distinguishable from those in the present case. In *Rushton*, the court was concerned with the inherent coerciveness of several instances of unlawful conduct or misrepresentations on the part of the police; id., 258; whereas here, the only allegedly coercive statement by the detectives was that they would secure the premises if they needed to obtain a search warrant. The court in *Rushton* found especially troubling that "the implication existed that if [the] defendant did not cooperate, incarceration would result . . . ." Id., 259. In the present case, at no time did the detectives make any reference to the defendant being arrested as a result of his failure to consent to the search. Further, the court in *Rushton* also concluded: "While the officers may have been able to remain on

[the] defendant's property during the time it took to obtain a warrant, it was a misrepresentation to imply that they could remain in [the] defendant's home, keeping him and his wife in custody, while a warrant was obtained." Id. Here, the court expressly found that neither the defendant nor his wife "were in custody. They were free to leave. Neither was restricted in any manner with respect to their liberty. No one was detained, no one was handcuffed . . . ." Thus, in light of the facts that the detectives could have remained on the premises for the purpose of securing the scene, and that they informed the defendant of his right to refuse consent and that he was free to leave, it is reasonable to conclude that the defendant's consent was the product of "his unconstrained choice." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 49 Conn. App. 743.

II

We next address the defendant's claim that the court improperly allowed the state to amend the information, after the trial had commenced, in violation of Practice Book § 36-18, to expand the time frame of the charged assault and risk of injury to a child. The defendant argues that the state failed to comply with Practice Book § 36-18, which permitted it to amend the information after the trial had begun. We disagree.

The following additional facts are relevant. When jury selection began on December 8, 2010, the operative information charged the defendant with risk of injury to a child and assault in the second degree with the time period for the offenses being "on or about May 7, through May 10, 2008 . . . ." Prior to the start of evidence, on January 28, 2011, the state filed a motion to amend the information regarding the date of the offenses to "on or about March, 2008, through May 11, 2008 . . . ." The stated reason for the amendment was the information obtained by the prosecutor, who had

traveled to Minnesota to interview the witnesses in preparation for trial. The court granted the state's motion to amend and found that "the amendment, as described, does not in any way prejudice or substantially prejudice the defendant's preparation of [his] defense." Additionally, the court found that "the state's explanation for the amendment at the time it proposed to file [it] is understandable in light of the ongoing investigation, which may have involved an out-of-state trip to Minnesota to interview a complaining witness or witness in this case." The court determined that "the state's reasoning is logical and in light of further trial preparation."

"On appeal, our [standard of review] of the court's decision to permit an amendment to the information is one of abuse of discretion." *State* v. *Caracoglia*, 78 Conn. App. 98, 101, 826 A.2d 192, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003). "Before a trial begins, the state has broad authority to amend an information pursuant to Practice Book § 36-17. Once the trial has started, however, the prosecutor is constrained by the provisions of Practice Book § 36-18." *State* v. *Wilson F.*, 77 Conn. App. 405, 411, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003). "If the state seeks to amend charges after the commencement of trial, it shoulders the burden of establishing that no substantive rights of the defendant would be prejudiced. . . . Like any other party petitioning the court, the state must demonstrate the basis for its request. Under [Practice Book § 36-18], the state must show: (1) good cause for the amendment; (2) that no additional or different offense is charged; and (3) that no substantive right of the defendant will be prejudiced. This allocation of burden encourages the state to prepare its case carefully because it bears the burden of justifying subsequent adjustments." (Internal quotation marks omitted.) *State* v. *Tanzella*, 226 Conn. 601, 614–15, 628

A.2d 973 (1993). We address in turn each prong of the test in *Tanzella*.

## A

We first examine whether the state satisfied the good cause prong of Practice Book § 36-18. The prosecutor had traveled out of state to interview the victim and other witnesses in preparation for trial. He obtained additional information regarding the frequency of the defendant's abuse. The state amended the information on the basis of the newly discovered time frame. We previously have upheld amendments that expand the time frame of a charged crime in order to conform to a victim's changed testimony. See *State* v. *Grant*, 83 Conn. App. 90, 98, 848 A.2d 549 ("[w]e conclude that by virtue of the change from the anticipated testimony of the victim, which occurred at trial, the state showed good cause sufficient to meet the first prong of Practice Book § 36-18"), cert. denied, 270 Conn. 913, 853 A.2d 529 (2004).

The defendant argues that the state did not have good cause for the amendment of the information because the state had control over when the witnesses would be interviewed and, therefore, the state could have anticipated or made allowance for the interviews to be conducted prior to the start of the trial. Important to our consideration of whether the state had good cause are our prior decisions in which we have recognized the special difficulty involved with the testimony of minor victims. "Under the circumstances of this case, the state had good cause to amend the information when such factors as the age of the [victim] at the time of the incidents, his age at the time of trial and his testimony concerning dates at trial are taken into consideration. There is no reason to believe that a more accurate date could have been solicited in earlier interviews." *State* v. *Wilson F.*, supra, 77 Conn. App. 413;

see also *State* v. *Grant,* supra, 83 Conn. App. 100–101 (same). These same factors apply in the case here and warrant our conclusion that the state had good cause to amend the information.

B

The second prong of *Tanzella* requires that no additional or different offense be charged in the amended information. This prong is easily established because no new charges were included in the amended information. Nevertheless, the defendant argues that by expanding the dates of the offenses, he essentially was charged with additional offenses. We are unpersuaded. The amended information charged the *exact* same two offenses as the original information: risk of injury to a child and assault in the second degree. See *State* v. *Morris,* 49 Conn. App. 409, 415, 716 A.2d 897 (proper for court to permit amendment to amplify or correct time of commission of offense when it is not material element of crime charged), cert. denied, 247 Conn. 904, 720 A.2d 516 (1998).

C

Third, the defendant claims that the amendment substantially prejudiced his rights, including his right to be notified of the crimes of which he stood charged and his right to prepare his defense adequately. As noted in part II B of this opinion, there were no new charges in the amendment and, therefore, the defendant stood in the same position prior to the amendment as being notified of the crimes of which he stood charged.

"For purposes of [Practice Book § 36-18], the decisive question is whether the defendant was informed of the charges with sufficient precision to be able to prepare an adequate defense." *State* v. *Tanzella,* supra, 226 Conn. 608. The defendant's defense was to deny all of the charges, and he testified that he had never struck

H, which conformed to this defense. It is unclear how additional time would have helped the defendant to prepare a more thorough defense. "A bare assertion of prejudice is not sufficient to support a claim of prejudice. . . . The defendant must provide a specific showing of prejudice in order to establish that he was denied the right of due process of law . . . . Such a showing amounting to a deprivation of his constitutional right to adequate notice of the charges against him is not made, however, merely by establishing that the presentation of his . . . defense may be more burdensome and difficult." (Citation omitted; internal quotation marks omitted.) *State* v. *Carneiro*, 76 Conn. App. 425, 439–40, 820 A.2d 1053, cert. denied, 264 Conn. 909, 826 A.2d 180, cert. denied, 540 U.S. 915, 124 S. Ct. 304, 157 L. Ed. 2d 208 (2003); see also *State* v. *Tanzella*, supra, 616 ("[T]he effect of the amendments was logically distinct from the defense asserted . . . . Moreover, nothing in the record suggests that the defendant would have presented a different defense if the amended offenses had been alleged at the outset, or that the defendant suffered any unfair surprise that deprived him of substantive rights."). Additionally, although the trial court initially denied the defendant's request for a two day continuance to prepare his defense in light of the amended information, due to inclement weather there was a two day delay in the proceedings and the court effectively reversed its denial of the request for a continuance. Under these circumstances, the defendant had fair notice and was not deprived of time to prepare his defense adequately.

The defendant also asserts that the amended information created a heightened risk that the jury relied on different acts in order to find him guilty. Although the time frame in the amended information was enlarged to include additional incidents occurring between March and May, 2008, the state presented its case on the basis of specific acts that caused the injuries evi-

denced in the photographs taken of H on May 12, 2008. For example, the state presented the photographic evidence of the bruises on H's face, as well as the testimonial evidence of H's injuries as observed on May 12, 2008, by school, and department of children and families and police personnel. Additionally, during closing arguments, the state argued that the defendant's belt was a dangerous instrument within the meaning of the assault statute; General Statutes § 53a-60 (a) (2); and asked the jurors to compare the belt to the bruises on H as reflected in the photographs. The court also gave a unanimity instruction to the jury on both charges.[5] "The jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions as to the law." (Internal quotation marks omitted.) *State* v. *Jennings*, 216 Conn. 647, 664, 583 A.2d 915 (1990). Thus, the amendment to the information amplifying the time in which the two offenses occurred did not prejudice the defendant's substantive rights. We conclude, therefore, that the court did not abuse its discretion in allowing the state to amend the information.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] The court instructed the jurors: "In order for you to find the defendant guilty of assault, you must all agree on the act that is the basis for the assault." Similarly, for the risk of injury charge, the court instructed: "With respect to the count of risk of injury, similarly, you must all agree on the act that is the basis for the offense of risk of injury. You must agree unanimously on the act as the basis for a conviction of risk of injury to a minor."