STATE OF CONNECTICUT *v.* VINCENT SANTIAGO
(AC 33217)

Lavine, Sheldon and Pellegrino, Js.

Argued January 3—officially released May 14, 2013

*Richard E. Condon, Jr.,* senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue,* assistant state's attorney, with whom, on the brief were *Brian W. Preleski,* state's attorney, and *Brett J. Salafia,* senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Vincent Santiago, appeals from the judgment of conviction rendered against him following a court trial on three counts of criminal possession of a firearm in violation of General

Statutes § 53a-217 (a) (1)[1] and one count of possession of a sawed-off shotgun in violation of General Statutes § 53a-211 (a).[2] On appeal, the defendant contends that the trial court erred in (1) failing to hold a hearing on and make a finding as to his competency to stand trial after ordering that he be evaluated for that purpose under General Statutes § 54-56d, and (2) denying his motion to suppress certain physical evidence seized in the course of a warrantless search of his apartment. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

At the conclusion of trial, the court made the following oral findings of fact. On May 14, 2008, New Britain police Officer Jerry Chrostowski received a tip from a confidential informant that the defendant, with whom Chrostowski had previously interacted in an unrelated police investigation, was willing to sell him firearms out of a garage on John Street in New Britain. The confidential informant further informed Chrostowski that he already had scheduled a meeting with the defendant for that purpose. On the basis of the tip, Chrostowski and Officer Adam Rembicz, also of the New Britain police department, drove together to a parking lot near 39 Whiting Street in New Britain, where they parked their unmarked police vehicle to observe the rendezvous between the defendant and the confidential informant. While at that location, the officers saw the confidential informant enter the defendant's car, then followed the car to 30 John Street in New Britain, where it stopped near a bank of garages. The officers next saw the confidential informant and the defendant enter

---

[1] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when such person possesses a firearm . . . and (1) has been convicted of a felony . . . ."

[2] General Statutes § 53a-211 (a) provides in relevant part: "A person is guilty of possession of a sawed-off shotgun . . . when he owns, controls or possesses any sawed-off shotgun that has a barrel of less than eighteen inches or an overall length of less than twenty-six inches . . . ."

one of the garages (garage), where they remained for approximately ten to fifteen minutes before exiting the garage, reentering the defendant's car and driving away. The officers followed the defendant and the confidential informant back to Whiting Street, where they parted ways.

The officers then returned to 30 John Street, where Chrostowski began to prepare a search warrant for the garage and the defendant's person based upon his recent observations and the information he had received from the confidential informant. The officers arranged for police surveillance of the garage while they left to obtain the warrant.

After procuring the warrant, Chrostowski and Rembicz drove to the defendant's residence at 55 Tremont Street in New Britain, where they parked in the southern parking lot. Thereafter, when the officers observed the defendant walking through the parking lot toward his car, they parked their unmarked police vehicle near the defendant's car, promptly exited it and approached the defendant while wearing football style jerseys with the words "New Britain Police" printed on the front and back. The officers told the defendant that they had a search warrant for him and his guns. In response, the defendant stated immediately that he had "some guns" in his apartment and spontaneously offered to show them to the officers.[3]

Rembicz performed a patdown search of the defendant, which did not reveal any weapons. The defendant then led the officers into his apartment building, where he conducted them to the door of his studio apartment, which he opened using his personal key. Once he and the officers entered the apartment, the defendant gestured with his hand toward the guns, stating simply,

---

[3] The officers did not inform the defendant that the search warrant did not authorize the search of his Tremont Street apartment.

without prompting: "[T]here they are." Chrostowski then noticed the stocks of two rifles protruding from the large assortment of motor vehicle parts that were scattered across the floor of the apartment. While Rembicz and the defendant stood in the kitchenette area of the apartment, Chrostowski first confirmed that the stocks were parts of two muzzleloader rifles, then found a Marlin .22 caliber rifle. Because the officers knew that the defendant was a convicted felon who was prohibited from possessing firearms,[4] they arrested him on site.

Following his arrest, the defendant orally consented to a search of his entire apartment by the officers, which he later confirmed by signing a written consent to search form. The officers' ensuing search of the apartment led to the discovery of ammunition for a twelve gauge shotgun and a set of keys.

After Chrostowski and Rembicz secured the previously described weapons and ammunition at the defendant's apartment, they drove to the garage to execute the search warrant, while two other officers transported the defendant to that location.[5] Upon arriving at the garage, the officers unlocked a padlock on the garage door using one of the keys they had found in the defendant's apartment. Inside the garage, the officers found a Chevrolet Corvette surrounded by another large assortment of motor vehicle parts scattered across the floor. Rembicz, while searching the garage floor on one side of the Corvette, found a Smith and Wesson .38 caliber revolver and a sawed-off Savage Arms twelve gauge shotgun.[6] Subsequent inspections of and tests

---

[4] The defendant previously was convicted of a felony on July 19, 2002.

[5] At trial, the owner of the garage testified that, at the time of the defendant's arrest, the defendant was renting the garage. The defendant personally delivered to the owner monthly rental payments.

[6] The state presented evidence that the shotgun had a barrel of fifteen inches in length.

performed on the weapons at the New Britain police outdoor range revealed that the .22 caliber rifle seized from the defendant's apartment and the twelve gauge shotgun and .38 caliber revolver seized from his garage were operable.

By way of a substitute long form information, the state charged the defendant with five counts of criminal possession of a firearm in violation of § 53a-217 (a) (1) and one count of possession of a sawed-off shotgun in violation of § 53a-211 (a) in connection with the seizures of the previously described weapons from his house and garage.[7] Prior to trial, the defendant filed a motion to suppress, inter alia, all firearms and ammunition that Chrostowski and Rembicz had seized during their warrantless search of the defendant's apartment. The defendant argued that his statements regarding the presence of guns in his apartment had been made during a custodial interrogation, which was conducted before he was given his *Miranda* warnings. See *Miranda* v. *Arizona,* 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Accordingly, claimed the defendant, his purported consent to the search of his apartment was the product of "illegal, non-Mirandized admissions."

After an evidentiary hearing on the motion to suppress, where the defendant, defense witness Luis Ocasio and the two arresting officers testified, the trial court denied the defendant's motion. The trial court found that the ammunition and firearms were lawfully

---

[7] Finding that the state failed to prove that the muzzleloaders were operable, the court acquitted the defendant on counts two and three of criminal possession of a firearm. The defendant also was charged with but not convicted of theft of a firearm in violation of General Statutes § 53a-212 (a). Although the officers' check of the revolver's serial number in the National Crime Information Center database revealed that it had been reported stolen on two occasions, the trial court found that the state had failed to sustain its burden of proof that the defendant knew or should have known that it was stolen.

seized from the defendant's apartment because he voluntarily had consented to both the initial entry of the apartment and the ensuing search thereof, during which the three rifles lawfully had been discovered in plain view.

At the end of trial, during which all of the seized firearms were introduced as evidence, the court found the defendant guilty of three counts of criminal possession of a firearm—in connection with the .22 caliber rifle (count one), the .38 caliber revolver (count four) and the twelve gauge shotgun (count five)—and one count of possession of a sawed-off shotgun (count seven). The trial court thereafter imposed a total effective sentence of fifteen years imprisonment, with the execution suspended after seven years, four of which are mandatory, followed by five years of probation.[8] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim on appeal is that the trial court committed reversible error by ordering a competency evaluation of him, but then failing to hold a hearing or to render a finding on the record as to his

[8] The defendant's sentence is broken down as follows: On counts one and four, charging criminal possession of a firearm with respect to the .22 caliber rifle and the .38 caliber revolver, respectively, the court imposed consecutive sentences of five years imprisonment, execution suspended after three years, two years of which on each count are mandatory, followed by five years probation. On count seven, charging criminal possession of a sawed-off shotgun in connection with the twelve gauge shotgun, the court imposed a sentence of five years imprisonment, execution suspended after one year, followed by five years of probation, to be served consecutively with the sentences imposed on counts one and four. Finally, on count five, charging criminal possession of a firearm in connection with the twelve gauge shotgun, the court imposed a sentence of five years imprisonment, execution suspended after two years, which are mandatory, followed by five years of probation, to be served concurrently with the sentences imposed on counts one, four and seven, for a total effective sentence of fifteen years imprisonment, execution suspended after seven years, four of which are mandatory, followed by five years of probation.

competency to stand trial. In response, the state argues that the trial court's failure to take such action was not improper in light of the defendant's waiver, through his counsel, of his rights to a full competency hearing and finding on the record as to his competency. Because the defendant did not raise this claim at trial, he asks this court to review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[9] and/or the plain error doctrine. Practice Book § 60-5. Concluding that the defendant effectively waived this claim, we decline to decide it on the merits.

At the outset, we recognize that, when a right has been affirmatively waived at trial, we generally do not afford review of its claimed denial on appeal, under either *Golding* or the plain error doctrine. *State* v. *Bharrat*, 129 Conn. App. 1, 17, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011). Thus, in *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007), our Supreme Court held that "unpreserved, waived claims, fail under the third prong of *Golding* . . . ." Similarly, in *State* v. *Corona*, 69 Conn. App. 267, 794 A.2d 565, cert. denied, 260 Conn. 935, 802 A.2d 88 (2002), this court held that, "[j]ust as a valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of *Golding* review, a valid waiver also thwarts plain error review of a claim. [The] [p]lain [e]rror [r]ule may only be invoked in instances of forfeited-but-reversible error

---

[9] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

. . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct. . . . The distinction between a forfeiture of a right (to which the [p]lain [e]rror [r]ule may be applied) and a waiver of that right (to which the [p]lain [e]rror [r]ule cannot be applied) is that [w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) Id., 274–75. Under the foregoing authorities, and on the basis of the record before this court, we decline to review the defendant's claim under either *Golding* or the plain error doctrine because we conclude that he waived his claim.

The record reveals the following additional facts, which are relevant to our resolution of the defendant's claim. On September 3, 2009, shortly before the scheduled start of trial, the defendant's attorney, Richard S. Cramer, made an oral motion for a competency examination of the defendant, pursuant to § 54-56d (c).[10] After canvassing the defendant regarding his competency, the court, *Strackbein, J.*, granted counsel's motion, and thus ordered a competency examination of the defendant pursuant to § 54-56d (d).[11] Thereafter, in a written

---

[10] General Statutes § 54-56d (c) provides: "If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

[11] General Statutes § 54-56d (d) provides in relevant part: "If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the Superior Court, there is probable cause to believe that the defendant has committed the crime for which the defendant is charged, the court shall order an examination of the defendant as to his or her competency. . . . The examination shall be completed within fifteen business days from the date it was ordered and the examiners shall prepare and sign, without notarization, a written report and file such report with the court within twenty-one business days of the date of the order. On receipt of the written report, the clerk of the court shall cause copies to be delivered immediately to the state's attorney and to counsel for the defendant."

report dated September 29, 2009 (report), the evaluation team unanimously determined, without qualification, that the defendant was competent to stand trial.[12]

At the next proceeding on October 1, 2009, two days after the report was issued, the court, *Vacchelli, J.*, asked Cramer whether he would be stipulating to the defendant's competency, as stated in the report.[13] Although Cramer indicated that he probably would waive a competency hearing, he stated that he would prefer to review the report, which he had just received, before he made his final decision on that issue.[14] Consistent with that preference, before the conclusion of the October 1, 2009 proceeding, Cramer expressly waived

Although § 54-56d (d) was amended after the date of the crimes at issue here, the changes are not relevant to this appeal. For convenience, we refer to the current revision of the statute.

[12] Although the report was not admitted into evidence, the report was filed with the trial court pursuant to § 54-56d (d). "It is well established that this court can take judicial notice of facts contained in the files of the Superior Court." (Internal quotation marks omitted.) *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 522 n.13, 911 A.2d 712 (2006). Accordingly, we take judicial notice of the report.

[13] Indeed, at the January 5, 2011 sentencing hearing, the court explained the general procedure employed in such circumstances: "[T]ypically, when there's a finding of competency, both sides stipulate, the report is admitted into evidence by agreement and there's a finding of competency. Usually, the only time there's a hearing is when one side challenges that, and I was never told there was such a challenge." See General Statutes § 54-56d (e); *State* v. *Mish*, 110 Conn. App. 245, 250–51, 954 A.2d 854, cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008).

[14] The following colloquy occurred during the October 1, 2009 proceeding:

"The Court: [Defense counsel], are you stipulating to competency as to the report dated September 29?

"[Defense Counsel]: Not at this time, Your Honor. I haven't really had a chance to review the report. It just apparently came in today. I tried yesterday to get a copy of the report. In [excess] of caution I'd like a brief continuance so I can review the report and determine where I go from here. [In all] [p]robability I'll waive any competency hearing, but I just want to go over the report real carefully before I make that decision.

"[The Prosecutor]: Waive any time constraints, [defense] counsel?

"[Defense Counsel]: Yes. . . .

"The Court: Okay, continue it to October 19, on the pretrial docket."

the ten day statutory deadline for holding a competency hearing prescribed by § 54-56d (e).[15]

The parties next appeared before the court, *Strackbein, J.*, on the October 19, 2009 pretrial docket. At that proceeding, the defendant rejected, against the advice of Cramer, the state's final plea offer and elected to go to trial, but neither the parties nor the court raised the unresolved issue of the defendant's competency to stand trial.

In fact, the issue of the defendant's competency to stand trial was not addressed again until more than one year later, at the very end of the defendant's sentencing hearing on January 5, 2011. At that time, during a brief postsentencing discussion between the court, *Kahn, J.*, and counsel regarding the defendant's appeal bond, Cramer opined that the failure of the court, *Strackbein, J.*, to comply with the procedural requirements of § 54-56d created a viable issue for appeal. The following colloquy then took place between the trial court, *Kahn, J.*, and Cramer:

"[The Court]: As to this issue that you raise, the competency evaluation, I know that I inquired whether he had been found competent, and no one raised with me the issue of he didn't waive a hearing or didn't have a hearing. I don't know if that creates a waiver for [the defendant] not having raised it, but that's an issue . . . the Appellate Court will take up and the issue of the appellate bond, I want more of your argument on that before I'm prepared to find that there is a meritorious issue on appeal.

---

[15] General Statutes § 54-56d (e) provides in relevant part: "The court shall hold a hearing as to the competency of the defendant not later than ten days after the court receives the written report. . . ."

Although § 54-56d (d) was amended after the date of the crimes at issue here, the changes are not relevant to this appeal. For convenience, we refer to the current revision of the statute.

"[Defense Counsel]: Yeah, I'll file a motion sometime this week, Your Honor. Let me clarify it. There's no question [the defendant] was evaluated, there's no question there's a report, there's no question it said that he's competent, there's no question Judge Strackbein, [I] and the state's attorney had it."

The court, *Kahn, J.*, concluded the discussion of the defendant's competency to stand trial by stating that it would order various transcripts to determine what precisely had transpired at the prior proceedings. Based on our review of the record, no further action was ever taken regarding the issue of the defendant's competency to stand trial.

"As a matter of constitutional law, it is undisputed that the guilty plea and subsequent conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. . . . This constitutional mandate is codified in our state law by [General Statutes] § 54-56d (a), which provides that [a] defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense. . . . General Statutes § 54-56d (b), however, posits a presumption in favor of a defendant's competence. . . . Every criminal defendant is presumed to be competent. General Statutes § 54-56d (b). During the course of the criminal proceedings, however, if it appears that the defendant is not competent, either party or the court may request an examination to determine the defendant's competency. General Statutes § 54-56d (c)." (Internal quotation marks omitted.) *State* v. *Crawley*, 138 Conn. App. 124, 139–40, 50 A.3d 349, cert. denied, 307 Conn. 925, 55 A.3d 565 (2012).

The defendant argues that the failure of the court to hold a § 54-56d (e) competency hearing and render an

explicit finding on the record as to the issue of his competency constitutes reversible error. We disagree.

Under § 54-56d (e), "[a] defendant and the defendant's counsel may waive the court hearing . . . if the examiners, in the written report, determine without qualification that the defendant is competent . . . ." "[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . *[W]aiver may be effected by action of counsel.* . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Emphasis added; internal quotation marks omitted.) *State* v. *McLaughlin*, 135 Conn. App. 193, 198, 41 A.3d 694, cert. denied, 307 Conn. 904, 53 A.3d 219 (2012).

"It is well established that implied waiver, as alleged in this case, arises from an *inference* that the defendant knowingly and voluntarily relinquished the right in question. . . . Waiver does not have to be express . . . but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so. . . . It also is well established that any such inference must be based on a course of conduct." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 483–84, 10 A.3d 942 (2011). Relevant cases inform us that a criminal defendant may implicitly waive one or more of his or her fundamental rights. *State* v. *Crawley*, supra, 138 Conn. App. 132. "In some circumstances, a waiver of rights must be knowing, voluntary and intelligent, and it must be expressly made. . . . In other circumstances, waiver can be implied . . . [and] [t]he waiver

can be made by counsel . . . ." *State* v. *Santiago*, 245 Conn. 301, 315–16, 715 A.2d 1 (1998).

Our application of the foregoing principles to the facts of the present case leads us to conclude that, based upon Cramer's course of conduct, the defendant waived his right to a full competency hearing and to a finding on the record regarding his competency to stand trial. On October 1, 2009, following the receipt of the evaluation team's unanimous and unqualified report, the court convened a hearing to determine the competency of the defendant. At this hearing, Cramer indicated that, after he reviewed the report, which he had in his possession, he probably would waive any competency hearing. Cramer also waived the time requirements of § 54-56d (e). Thereafter, Cramer failed to raise the issue of competency again until after the conclusion of the defendant's trial, more than one year later. In the interim, Cramer represented the defendant in all remaining pretrial and trial proceedings without ever raising the issue of competency or disputing the examiners' determination. Cramer demonstrated his knowledge of the defendant's right to a hearing as to his competency when he sought the initial competency evaluation pursuant to § 54-56d. As the defendant's attorney, Cramer had an obligation, which he understood, to provide input to the court if his observations of the defendant contradicted the findings of the competency report. See *State* v. *Mitchell*, 54 Conn. App. 361, 368, 738 A.2d 188 ("American Bar Association's [c]riminal [j]ustice [m]ental [h]ealth [s]tandards . . . advise defense counsel to move for an evaluation of the defendant's competence to stand trial whenever he in good faith doubts his client's competence"), cert. denied, 251 Conn. 910, 739 A.2d 1250 (1999), cert. denied, 528 U.S. 1171, 120 S. Ct. 1197, 145 L. Ed. 2d 1101 (2000). Cramer's silence and inaction regarding the resumption of the

defendant's competency hearing only can be understood to constitute the voluntary abandonment of a known right of his client. We therefore decline to review it under either *Golding* or the plain error doctrine.

## II

The defendant also claims that the trial court improperly denied his motion to suppress the .22 caliber rifle obtained during the police search of his apartment.[16] On that score, the defendant now contends that the court improperly found that he freely and voluntarily consented to the search and, therefore, that the warrantless search of his apartment violated his constitutional rights. The defendant now argues, more specifically, that the searching officers acted in a deceptive manner when they approached him in the parking lot of his apartment building and stated that they had "a search warrant for [him] and for guns," clearly implying that they had a warrant authorizing the search of his apartment. Accordingly, the defendant contends, his consent was not voluntary because it was the product of unlawful deception, and thus the .22 caliber rifle should have been suppressed and his conviction of criminal possession of that rifle, under count one of the information, should be reversed. We disagree.

"It is axiomatic that searches and seizures inside a home without a warrant are presumptively unreasonable. . . . A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with

---

[16] The defendant's motion to suppress concerned only the firearms seized from his apartment. Because the defendant was not convicted under counts two and three of violations of § 53a-217 (a) (1) for possession of the two muzzleloader rifles, the defendant's second claim on appeal concerns only count one, under which he was convicted of possessing the .22 caliber rifle in violation of § 53a-217 (a) (1).

authority to do so has freely consented. . . . The question of whether a defendant has given voluntary consent to enter or search his or her premises is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the entry or search. . . .

"The voluntariness of the consent is normally decided by the trial court based on the evidence it deems credible along with reasonable inferences that can be drawn therefrom. . . . Whether there was a valid consent to search is a factual question that will not be lightly overturned on appeal. . . . The ultimate question is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice. . . .

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Mullien*, 140 Conn. App. 299, 305–306, 58 A.3d 383 (2013).

"In determining whether a defendant's will was overborne in a particular case, the [c]ourt has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 250–51, 3 A.3d 806 (2010). "In evaluating the voluntariness of the defendant's consent, we note that, while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate

such knowledge as a prerequisite to establishing a voluntary consent." (Internal quotation marks omitted.) Id., 251.

In determining whether consent was voluntarily given, the ultimate question is whether the will of the defendant was overcome by unlawful coercion. *State v. Mullien*, supra, 140 Conn. App. 306. The focus of the trial court's inquiry was, therefore, on the defendant's state of mind at the time of his purported consent. This determination is reserved for the trial court based on the evidence it deems credible. Id. It is axiomatic that "the weighing of the evidence is the province of the trial court, and we will disturb the trial court's findings of fact only if they are clearly erroneous on the record as a whole. . . . *The determination of a witness' credibility is the special function of the trial court.* This court cannot sift and weigh evidence." (Citation omitted; emphasis added; internal quotation marks omitted.) *State v. Thompson*, 307 Conn. 567, 575, 57 A.3d 323 (2012).

The following additional facts are relevant to our resolution of this claim. At the suppression hearing, the defendant presented testimony that is diametrically opposed to the theory that he now argues on appeal. Whereas he now claims on appeal that his purported consent was the product of a misleading claim of lawful authority, he claimed before the trial court that his "consent" was the product of the officers' impermissible use of coercive tactics and physical force. On that score, at the hearing on his suppression motion, the defendant testified that when the officers confronted him in the parking lot of his apartment building, they immediately placed him in handcuffs and then asked him whether he had any firearms. After he told the officers he had guns in his apartment, they assertedly demanded to see them, grasped him by the arms and forcibly led him to the apartment building door. The

officers then reached into his pocket to locate his key and used it to open the door. After entering the building, the officers escorted him to his apartment, where, with their hands on him, they used his key to open the door and enter his apartment without his consent.

In contrast, Chrostowski testified at the suppression hearing, as he later did at trial, that he and Rembicz approached the defendant and advised him that they had a search warrant, at which point the defendant asked: "What's it about?" Chrostowski responded: "It's a search warrant for you and for guns." The defendant then spontaneously revealed that he had guns in his apartment and invited the officers into his apartment to see them, at which point the defendant, Chrostowski and Rembicz entered the defendant's apartment. Once inside, the officers found three rifles—one of which was the .22 caliber rifle here at issue—in plain view on the floor of the apartment.

Our application of the foregoing principles to the facts of the present case leads us to conclude that the defendant voluntarily consented to the search of his apartment. We reach this conclusion by examining the totality of the circumstances. *State* v. *Jenkins*, supra, 298 Conn. 250. Here, the state presented evidence from which the trial court reasonably could conclude that the defendant consented freely and voluntarily to the officers' entry into and ensuing search of his apartment. Testimony was adduced at the suppression hearing that the officers approached the defendant, attempting to execute a valid search warrant. Chrostowski testified that he and Rembicz informed the defendant that they had a search warrant for his person and for guns, and the defendant immediately volunteered that he had guns in his apartment. The defendant freely invited the officers into his apartment and, once inside, gestured to the floor, indicating the firearms, which were scattered among various automotive parts. On the basis of our

review of the record, we conclude that the court's findings that the defendant voluntarily made the statements at issue and freely consented to the search of his apartment were not clearly erroneous and that its denial of the defendant's motion to suppress was supported by the facts.

On appeal, the defendant argues, nevertheless, that his purported voluntary consent amounted to nothing more than mere acquiescence to an implied claim of legal authority to search his apartment for guns. See *Bumper* v. *North Carolina*, 391 U.S. 543, 548–49, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). The defendant argues that when Chrostowski told him that he and Rembicz had a search warrant for the defendant and his guns, Chrostowski impliedly represented that the warrant authorized a search of the defendant's apartment, constituting an unlawful claim of authority. We disagree.

Here, the trial court found that the officers were voluntarily invited into the defendant's apartment, and that finding is supported by the record. There was no mere acquiescence to a false claim of lawful authority, like the nonexistent search warrant in *Bumper*. See id. Chrostowski and Rembicz did not claim to have a warrant to search the defendant's apartment. Rather, they were attempting to execute a valid search warrant when the defendant voluntarily stated that he had guns in his apartment and spontaneously offered to show them to the officers. While Chrostowski's statement that he had a search warrant for the defendant and his guns was ambiguous as to the location of the guns to be searched for, there was no unreasonable deception that vitiated the voluntary nature of the defendant's consent. Furthermore, although the defendant was not advised that he need not allow the officers into his home, and knowledge of the right to refuse consent to entry is relevant to the determination of voluntariness, such advice is not a prerequisite to voluntary consent.

*State* v. *Jenkins*, supra, 298 Conn. 251; see also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent"). Indeed, "[t]he spontaneous nature of [the defendant's] invitation [to the officers to show them his firearms], which was not given in response to a specific request for consent to search, renders inapposite the officers' failure to advise the defendant of his right to refuse to consent to the search." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 252–53. Because "it is uniquely the function of the trier of facts to weigh the evidence and assess the credibility of witnesses [when there is conflicting testimony]"; (internal quotation marks omitted) *State* v. *Mullien*, supra, 140 Conn. App. 307; we cannot conclude that the trial court's finding that the defendant voluntarily consented to the officers' search of his apartment is clearly erroneous.[17]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] In further support of his claim that he did not voluntarily consent to the officers' search of his apartment, the defendant argues that he has a low intelligence quotient and other mental infirmities, which, considered in conjunction with Chrostowski's statement that he had a warrant to search for the defendant's guns, further demonstrates that the defendant merely acquiesced to an implied claim of authority. The defendant, however, did not present any evidence to the trial court regarding these issues and raised them for the first time at his posttrial sentencing hearing. Accordingly, we decline to address this claim on appeal. See *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).