******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTHONY DYOUS
(AC 35670)

Lavine, Prescott and West, Js.

*Argued May 19—officially released September 30, 2014*

(Appeal from Superior Court, judicial district of
Windham, Boland, J.)

*Robert E. Byron*, assigned counsel, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Roger R. Caridad*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Anthony Dyous, appeals from the judgment of the trial court granting the state's second petition for an order of continued commitment filed pursuant to General Statutes § 17a-593 (c).[1] On appeal, the defendant claims that (1) the order of continued commitment to the Psychiatric Security Review Board (board) violates his right to equal protection as against mentally disordered prison inmates,[2] and (2) his April 8, 2011 criminal conviction constitutes a finding by the trial court that he is sane and, therefore, "the state no longer has a rationale for his commitment." We affirm the judgment of the trial court.

The criminal activity that led to the defendant's initial commitment occurred on December 28, 1983, and was described in detail in *State* v. *Dyous*, 307 Conn. 299, 302, 53 A.3d 153 (2012) (*Dyous I*). We briefly recount those facts and the procedural history that inform the present appeal. The defendant had been hospitalized in a psychiatric facility three times prior to December 28, 1983, when he hijacked a bus carrying forty-seven people and threatened the driver with a bomb and nerve gas. Id., 304. At the time, the defendant stated that God had asked him to deliver a message. Id. On March 22, 1985, he was found not guilty by reason of mental disease or defect of two counts of kidnapping in the first degree, two counts of threatening in the second degree, and one count of carrying a dangerous weapon. The defendant was committed to the custody of the Commissioner of Mental Health for a period not to exceed twenty-five years. Id., 302. In March, 1985, the defendant was transferred to the custody of the board pursuant to General Statutes § 17a-582. Id.

Initially, the defendant was confined to Whiting Forensic Institute (Whiting), but later was transferred to Norwich State Hospital (Norwich). Id., 304. He escaped from Norwich in 1986. Id. Nine months later, he was located in Mexico, returned to Connecticut, and readmitted to Whiting. Id. Upon readmission, the defendant was grossly psychotic and experiencing auditory and visual hallucinations, as well as grandiose and persecutory delusions. Id. While he was at Whiting, he was involved in a violent incident during which he, other patients, and staff members sustained injuries. Id.

Between 1989 and 2005, the defendant moved between Whiting, Norwich, and Connecticut Valley Hospital. Id., 304–305. Between 1990 and 1992, he was granted a number of temporary leaves that were terminated when he tested positive for cocaine. Id., 305. In 1996, the defendant exhibited signs of psychosis and admitted that he had not been taking his antipsychotic medication. Id. He was admitted to Connecticut Valley Hospital, but he refused to take his medication. He later escaped. When he was found, he was returned to

Whiting, where he exhibited psychotic and paranoid symptoms, and delusional thinking. Id. He was violent and had to be placed in restraints. Id. The defendant's behavior "was characterized by chronic refusal to take medication, irritability, mood lability, grandiosity, paranoid ideation, rule breaking, physical altercations with peers and refusal to engage meaningfully in treatment." (Internal quotation marks omitted.) Id.

In October, 2003, the defendant filed an application for discharge from the custody of the board that was denied by the court, *Foley, J.* The defendant filed a second application for discharge from the custody of the board in March, 2007, that was denied by the court, *Swords, J.* On April 27, 2009, the state filed a petition for an order of the defendant's continued commitment to the board. The defendant filed a motion to dismiss the petition and a supplemental motion to dismiss the petition in February, 2010. Judge Swords held a hearing on the second petition and the defendant's motions to dismiss on February 24, 2010. The court granted the state's petition for an order of continued commitment and denied the defendant's motions to dismiss. The defendant appealed from the judgment of continued commitment. Our Supreme Court affirmed that judgment in *Dyous I.*

On April 24, 2012, the state filed a second petition for an order of continued commitment on the ground that the defendant "remains mentally ill to the extent that his discharge [from the board's jurisdiction] would constitute a danger to himself or others." The case was tried to the court, *Boland, J.*, on February 28, 2013, and March 15, 2013.[3] The court granted the state's second petition and recommitted the defendant to the custody of the board until March 18, 2018.

In ruling on the second petition for continued commitment, Judge Boland found that since July, 2004, the defendant has refused to provide a DNA sample as required by General Statutes § 54-102g. For eighteen months, he consistently refused to take his medication. He remained symptomatic, but not to a degree that required the involuntary administration of medication. Nonetheless, the defendant's cooperation improved and his aggressive behavior diminished so that in July, 2006, he was transferred to Dutcher Hall at Connecticut Valley Hospital and was permitted to move about the campus without an escort. In January, 2009, the defendant's anger and resentment about his ongoing hospitalization, however, resulted in a notable deterioration in his condition despite therapeutic intervention. The court found that the defendant insisted that he "could make it on his own without medication and without the oversight of the medical profession."

Although he noted the defendant's prior history, Judge Boland gave greater weight to events that have occurred since the 2010 extension of the defendant's

commitment. In March, 2010, the defendant described himself as a "P.O.W.," who was being held in violation of human rights standards. On April 26, 2010, he assaulted another patient by hitting the patient with a radio, leading to his conviction on April 8, 2011, of assault in the third degree. Chemical tests administered at about that time revealed that for more than two years, the defendant falsely had indicated that he was taking his medication; he surreptitiously was spitting out the pills.

The court found the following events outlined in the board's report. On December 29, 2010, the defendant pushed another patient to the floor and grabbed the patient by the throat. The incident ended only when hospital police intervened. In March, 2011, a female patient complained of the defendant's behavior, which was "characterized as sexual harassment and unwelcome (but not, apparently, criminal) touching." Between March, 2010, and June, 2012, the defendant's posture toward the medical staff was influenced by his belief that his commitment was illegal. He refused to engage in therapy or to take his medication. The staff determined that the defendant continued to be mentally ill and in need of medical attention. In June, 2012, the defendant exhibited greater cooperation and self-control, but he continued to refuse to take his medication. The results of the defendant's September 15, 2012 psychological assessment revealed that he had no current acute symptoms of bipolar disorder, and that, within an institutional setting he has refrained from using alcohol and illegal drugs.

At the hearing on the second petition to extend the defendant's commitment, the board's report to the court was placed into evidence, and Mahboob Aslam, the defendant's treating psychiatrist, testified. The court noted Aslam's expert testimony that "interepisodal recovery while a patient remains in a highly structured environment is common; equally common . . . is the predictability of a relapse when a person leaves that structure," as the person lacks insight into his malady, and resists taking medication and continuing in therapy.

In its memorandum of decision, the court found that a clinical consensus existed that the defendant remains mentally ill and, despite his present state of relative lucidity, needs medication, which he refuses to take, and support, which he rejects. The court also found that if the defendant is to become a person who is not a danger to himself or others, he needs to take his medication and accept support. The court found by clear and convincing evidence that, at the time of the hearing, the defendant presented a danger to himself or to others such that he would be a risk of imminent physical injury to others or to himself if he were released.[4] The court granted the petition and extended the defendant's commitment to the board until March 18, 2018. The defendant appealed.

## I

The defendant claims that, by granting the state's second petition for his continued commitment, the court violated "his equal protection rights as against mentally disordered prison inmates who are not subject to unwilling continued confinement."[5] The defendant's claim fails, as the record is inadequate for our review.

At the hearing on the second petition to extend the defendant's commitment, following the state's presentation of evidence, the defendant presented no evidence, despite the fact that the court had continued the hearing to enable him to do so. See footnote 3 of this opinion. During his final argument, counsel for the defendant stated in part that the defendant's case presented an equitable issue, but he was not "going to phrase it in terms of equal protection because [*Dyous I*] pretty much put paid to that.[6] But there is an issue of fundamental fairness as [the defendant] stands in relation to people similarly situated in a prison system. Now, as Your Honor well knows, mental disorder is a big problem with inmates. The office of personnel and management put out a recidivism report in 2010. And one of the focuses of that report was a cohort of mentally disordered patients . . . inmates who had been released during the year 2005.

"Now, there were 1500 . . . inmates diagnosed as severely mentally disordered who were released. Now, [the] Department of Correction doesn't give diagnoses. They give what they call MPH levels, and those go to the severity of the mental disorder. Now, of those 1500—those 1500 were rated MPH-4 and MPH-5. MPH-4 describes inmates who . . . have intensive psychiatric problems and who are probably on psychotropic medication. MPH-5 describes inmates who are in crises states and who require twenty-four hour nursing care. [The defendant] is neither of those. [He] doesn't take psychotropic medication. He's certainly not in any kind of crisis state. He doesn't take twenty-four hour nursing care. [The defendant's] problem, insofar as the system is concerned, is not mental, it's behavioral.

"When considering whether to release [the defendant] . . . one of the factors to consider is whether it is fair to keep [him] confined when the system will release 1500 mentally disordered inmates in one year who are profoundly more psychiatrically disordered than [he is]." (Footnote added.)

Counsel for the defendant later stated: "I think the court can and probably should consider what happens with people released from the correction system. And now those 1500 inmates, probably half of whom . . . had a very high recidivism rate. In fact, the recidivism rate for that cohort, that the recidivism study for 2010 . . . was 67 percent, and the rate for people with mental disorders was higher than that. Now, that's in contrast

to the recidivism rate for people going through Connecticut Valley Hospital under the jurisdiction of the [board]. Now, the [board] in its report of 2009–2010 . . . indicates that its recidivism rate for acquittees on conditional release for that year was zero."

Counsel for the defendant continued: "The point of all that is that, that kind of macro consideration, combined with [the defendant's] record of nonoffending when he's been out in the community, establish[es] a reasonable probability that he won't reoffend. Even if he relapses, given what happened to him on his escapes, he still won't reoffend."

In its memorandum of decision, the court stated, in part, "[i]n closing argument, counsel for [the defendant] made a spirited case that [the defendant] ought to be released on equitable grounds, citing claimed practices of the Department of Correction applicable to prisoners under its jurisdiction with mental illness diagnoses. *The factual basis of that claim was not established*, but even if true, what policies inhere in that situation are not those which govern resolution of the instant question." (Emphasis added.) Moreover, the court found that defense counsel's argument that the defendant "has done well at times during his years of confinement, and even at times of temporary release into the community, are inadequate to offset the voluminous evidence that such releases have led to further problems, and that those problems have repeatedly been serious and probative of the need to continue his commitment to the board."

In his brief on appeal, the defendant states that the present "case revisits the continuing commitment of the defendant . . . recently the subject of [*Dyous I*]," which upheld the 2010 judgment continuing his commitment to 2013.[7] The present appeal, he states, "argues issues not presented to the court in" *Dyous I*. He contends that the present issue is whether the order continuing his commitment violated his equal protection rights as against mentally disordered prison inmates who are not subject to unwilling continued confinement. The defendant also contends that that issue requires "a determination as to whether recommitting acquittees, who tend not to reoffend, serves to 'protect society,' as expressed in General Statutes § 17a-593, when the state releases disordered prison inmates who reoffend at rates not only higher than acquittees, but higher than inmates without disorder. Attention as well should be given to how this disparate treatment 'protects society' when it works to discredit the process of treatment obtained through the criminal justice system by way of claiming the defense of mental disease or defect, such that the offenders who need treatment forgo it so as not to be confined indefinitely, even though forgoing treatment raises the likelihood they will reoffend."[8] It appears to us that the defendant is

challenging the factual premise on which § 17a-593 (c) is predicated, i.e., to protect society from acquittees, and our Supreme Court's finding that the statute withstands intermediate scrutiny with regard to the defendant's constitutional right to equal protection. See *State* v. *Dyous*, supra, 307 Conn. 303.

On appeal, the defendant recognizes that he may not have raised the equal protection claim clearly at the hearing on the second petition for his continued commitment, and he seeks reversal of his commitment pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We construe the defendant's statement as a concession that the equal protection claim was not raised at trial. We are unable to review the claim, however, because the record is inadequate.

"In *Golding*, our Supreme Court held that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis added; internal quotation marks omitted.) *State* v. *Daniel G.*, 147 Conn. App. 523, 539, 84 A.3d 9, cert. denied, 311 Conn. 931, 87 A.3d 579 (2014).

"[U]nless the defendant has satisfied the first *Golding* prong, that is, unless the defendant has demonstrated that the record is adequate for appellate review, the appellate tribunal will not consider the merits of the defendant's claim. . . . [I]n the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred. . . . Thus, as [our Supreme Court] stated in *Golding*, we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Joseph*, 150 Conn. App. 867, 869–70, 93 A.3d 1174 (2014).

As the trial court found, the defendant presented *no evidence* at the trial. Nonetheless, the defendant argued to the trial court that the recidivism rate of persons who have been found not guilty of crimes on the ground of mental disease and defect is lower than that of inmates who are mentally disordered and released. It is well known that the arguments of counsel are not evidence. See *State* v. *Begley*, 122 Conn. App. 546, 552 n.10, 2 A.3d 1 (2010). In its memorandum of decision, the court acknowledged the defendant's argument but found that there was no evidentiary basis to support

it.[9] We conclude that not only did the defendant fail to clearly articulate his claim during his argument, he also did not litigate it.[10] To permit a party to raise a claim on appeal that was not properly presented at trial is unfair to both the trial court and the parties, and amounts to trial by ambuscade. See, e.g., *State* v. *Holloway*, 117 Conn. App. 798, 814, 982 A.2d 231 (2009), cert. denied, 297 Conn. 925, 998 A.2d 1194 (2010). Because the record is inadequate for review, the defendant's claim fails.

## II

The defendant's second claim is that his April 8, 2011 conviction of assault in the third degree in violation of General Statutes § 53a-61 constitutes a finding by the trial court that he is sane and, that being so, "the state has lost its rationale to keep him committed." We disagree.

In its memorandum of decision issued with respect to the second petition to extend the defendant's commitment to the board, the court stated that the question before it was whether the defendant "is at present a danger to himself or others." In its memorandum of decision, the court concluded by stating that it had found by clear and convincing evidence that the defendant, "at the time of this hearing, presents a danger to himself or to others such that to release him at this time would risk imminent physical injury to others or to himself, or the risk of loss or destruction of the property of others." The court therefore granted the petition and extended the defendant's commitment to the board until March 18, 2018.

Counsel for the defendant began his final argument to the trial court by stating: "Your Honor, I obviously cannot argue that [the defendant] does not have a mental disorder. But neither the [board's] report to the court, nor . . . Aslam's testimony, demonstrate that he's insane." Here on appeal, the defendant claims that because he was convicted of assault in the third degree in April, 2011, he is sane. Again, the defendant has raised a claim for which he presented no evidence at trial.

"It is well established that this court can take judicial notice of facts contained in the files of the Superior Court." (Internal quotation marks omitted.) *State* v. *Santiago*, 142 Conn. App. 582, 592 n.12, 64 A.3d 832, cert. denied, 309 Conn. 911, 69 A.3d 307 (2013). We have taken judicial notice of the file in the defendant's April 8, 2011 conviction of assault in the third degree. See *State* v. *Dyous*, Superior Court, judicial district of Middlesex, Docket No. CR-10-0192091-S (April 8, 2011).

On April 26, 2010, the defendant was charged with assault in the second degree and disorderly conduct for attacking another patient at Connecticut Valley Hospital. He did not assert the affirmative defense of not guilty by reason of mental disease or defect pursuant

to General Statutes § 53a-13. Consequently, there was no adjudication of the defendant's mental state at the time he was convicted.[11]

Moreover, the defendant's claim that he is sane and therefore should be released from the custody of the board is logically flawed. The court found that the evidence presented at the hearing demonstrates that the defendant is mentally ill to the extent that he poses a danger to himself or to society if discharged. The defendant has not challenged that finding; in fact, he concedes that he has a mental illness.

Moreover, the defendant's April 8, 2011 conviction of having assaulted another patient is further evidence that, even within the structure provided by Connecticut Valley Hospital, he presents a danger to others. "The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness. See *Lynch* v. *Overholser*, 369 U.S. 705, 714 [82 S. Ct. 1063, 8 L. Ed. 2d 211] (1962) (The fact that the accused was found to have committed a criminal act is strong evidence that his continued liberty could imperil the preservation of public peace). Indeed, this concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil commitment-proceeding." (Footnote omitted; internal quotation marks omitted.) *Jones* v. *United States*, 463 U.S. 354, 364, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1962).

In the present case, the defendant does not claim, nor has he demonstrated, that the court's finding that he presents a danger to himself or to others such that to release him at this time would risk imminent physical injury to others or to himself, or the risk of loss or destruction of the property of others, is clearly erroneous, recidivism rates notwithstanding. We therefore conclude that the court properly granted the second petition to extend the defendant's commitment to the board.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 17a-593 (c) provides in relevant part: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment [from the jurisdiction of the board] would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."

[2] Pursuant to General Statutes § 17a-515, mentally disordered inmates are subject to the commitment proceedings as set forth in General Statutes § 17a-498 (c), which provides in relevant part: "If, on such hearing, the court finds by clear and convincing evidence that the person complained of has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, it shall make an order for his or her commitment, considering whether or not a less restrictive placement is available, to a hospital for psychiatric disabilities to be named in such order, there to be confined for the period of the duration of such psychiatric disabilities or until he or she is discharged or converted to voluntary status pursuant to section 17a-506 in due course of law. . . ."

[3] The state presented evidence on February 28, 2013, and the court continued the matter until March 15, 2013, to permit the defendant to present expert testimony. On March 15, 2013, counsel for the defendant informed the court and the state that the defendant would present no evidence.

[4] The court found that the defendant has a compound mental health diagnosis: in Axis I, bipolar I disorder, cannabis abuse in remission, alcohol abuse in remission, and in Axis Il, personality disorder not otherwise specified with antisocial and narcissistic traits.

[5] The state claims that the defendant's equal protection claim is res judicata by virtue of our Supreme Court's decision in *Dyous I*. We need not reach the state's argument, as the defendant seeks review of his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and we conclude that the record is inadequate for our review.

[6] The words "pretty much put paid to that" accurately reflect the transcript of the defense counsel's argument.

[7] To summarize substantially, in *Dyous I*, our Supreme Court concluded that the defendant's right to equal protection was not violated when compared with the rights of inmates who are civilly committed. *State* v. *Dyous*, supra, 307 Conn. 299. The court acknowledged that the system devised by the legislature "tilts" more strongly toward confinement for acquittees than civilly committed inmates. Id., 325. This is so because the legislature directed the Superior Court and the board to consider its primary concern to be " 'the protection of society . . . .' " Id., 323. In civil commitment proceedings, the legislature "has directed physicians providing opinions to the Probate Court to consider whether or not less restrictive placement is recommended and available . . . ." (Citations omitted; internal quotation marks omitted.) Id.

The court stated that "[i]t is undisputed that the continued commitment procedure that is applicable to insanity acquittees serves the important governmental interests of protecting society and affording acquittees proper psychiatric treatment." Id., 326. The court did not "examine the various restrictions that the system imposes on insanity acquittees once they have been recommitted"; id.; but focused "instead on the fact that the system applicable to insanity acquittees renders their recommitment easier for the state to obtain in the first place. If that fundamental disparity withstands intermediate scrutiny, so must the lesser disparities that accompany it." Id. The issue was "whether subjecting no one but acquittees to a recommitment procedure that operates in a way that its primary concern is to protect society . . . substantially relates to the achievement of either of the aforementioned governmental interests." Id., 326–27. The state bears the burden of establishing the relationship between the nature of the problem and the legislative remedy, but not to a scientific certainty. Id., 327. "[I]n judging the closeness of the relationship between the means chosen . . . and the government's interest, three interrelated concepts must be considered: the factual premises which prompted the legislative enactment, the logical connection between the remedy and those factual premises, and the breadth of the remedy chosen." (Internal quotation marks omitted.) Id., citing *Ramos* v. *Vernon*, 353 F.3d 171, 183 (2d Cir. 2003).

Our Supreme Court rejected the defendant's claim that § 17a-593 (c) is unconstitutional as applied to him because it agreed with the state that "subjecting the defendant to a recommitment procedure that tilts more strongly in favor of commitment than does its civil counterpart substantially relates to the achievement of the important governmental interest of protecting society." Id., 327. "The factual premise undergirding § 17a-593 is that the defendant's prospective release raises a special concern for public safety. This concern arises because of two key facts; first, the defendant suffers from a long-standing mental illness that has persisted despite years of intensive treatment; and, second, the defendant previously was adjudicated to have committed a crime—indeed, a dangerous crime—as a result of his mental illness." Id., 328.

[8] In his appellate brief and appendix, the defendant relies on a wide variety of policy arguments, purported studies, government statistics, psychiatric journals, unproven assertions, and the like, to support his argument, including his claim that acquittees are being unfairly subjected to longer periods of confinement than inmates not civilly committed. In its brief, the state requests that we not consider the information in the defendant's footnotes and appendix, as it is not part of the record. Many of the defendant's assertions require factual findings, which were not made by the trial court, as the defendant presented no evidence.

[9] The defendant does not claim that the court's finding that he presented no evidence is clearly erroneous.

[10] In the appendix to his appellate brief, the defendant has submitted photocopies of recidivism studies, portions of the Diagnostic and Statistical Manual of Mental Disorders (2013), and other reports and articles. Documents and reports not admitted as evidence at trial are not properly before this court, as they are not part of the trial court record. A reviewing court cannot go beyond the proper record before it in the determination of issues presented on appeal. See *Grunschlag* v. *Ethel Walker School, Inc.*, 189 Conn. 316, 320, 455 A.2d 1332 (1983). "It is axiomatic that this court does not take evidence and does not make factual determinations." *Argentinis* v. *Fortuna*, 134 Conn. App. 538, 544, 39 A.3d 1207 (2012). The state argues that because the documents are not part of the record, this court should not consider them, citing *State* v. *Enrique F.*, 146 Conn. App. 820, 833 n.7, 79 A.3d 141 (2013), cert. denied, 311 Conn. 903, 83 A.3d 350 (2014). We agree with the state and have not considered the materials in the defendant's appendix.

[11] The trial court, *Handy, J.*, ordered a competency evaluation of the defendant. Thereafter, the defendant and the state stipulated to the content of the evaluation report and waived a competency hearing for the defendant. The court found that the defendant was competent to assist in his defense. Thereafter, the defendant pleaded guilty to assault in the third degree under the *Alford* doctrine. See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). The court granted an order of conditional discharge.

Our Supreme Court has stated that "[c]ompetence to stand trial . . . is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense . . . and the fact that [a] defendant was receiving medication and would require medication during the course of the trial does not render him incompetent. . . . A fortiori, a finding of mental illness is not required for a court to find a defendant incompetent to stand trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bigelow*, 120 Conn. App. 632, 642–43, 994 A.2d 204, cert. denied, 297 Conn. 916, 996 A.2d 278 (2010); see *State* v. *DeAngelis*, 200 Conn. 224, 230, 511 A.2d 310 (1986). Conversely, a defendant who suffers from mental illness is not necessarily incompetent to stand trial.