******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MATTHEW VAUGHT
(AC 35996)

Gruendel, Beach and West, Js.

*Argued January 12—officially released May 5, 2015*

(Appeal from Superior Court, judicial district of New Haven, geographical area number seven, Oliver, J.)

*Cody N. Guarnieri*, with whom, on the brief, was *David K. Jaffe*, for the appellant (defendant).

*Lisa Herskowitz*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Seth R. Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Matthew Vaught, appeals from the judgment of conviction, rendered following a jury trial, of attempt to possess one kilogram or more of a cannabis-type substance with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 53a-49 (a) (2) and 21a-278 (b), and criminal possession of a revolver in violation of General Statutes § 53a-217c. On appeal, the defendant argues that the court improperly (1) granted the state's motion for joinder of two cases against him and (2) denied his motion to suppress evidence related to a warrantless search of his home. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On June 10, 2011, members of the North Haven Police Department, with the assistance of a trained canine named Zeus, conducted a parcel interdiction at the FedEx shipping facility in North Haven. During this process, the police removed two packages from a conveyor belt for inspection.[1] The packages had the same FedEx tracking number and were addressed to Jennifer Stewart, 110 Dexter Avenue in Meriden. Although the shipping label indicated that the packages originated in Jamaica, New York, FedEx was able to determine that the packages originated in Phoenix, Arizona. A senior manager with FedEx opened one of the packages, and it contained what was later determined to be marijuana.[2] At this point, the North Haven Police Department contacted the statewide narcotics task force, a division of the state police, which indicated that it was going to conduct a controlled delivery of the packages at 110 Dexter Avenue in Meriden.

Later that same day, Robert Lawlor, a sergeant with the statewide narcotics task force, drove to 110 Dexter Avenue in Meriden in a vehicle made to look like a FedEx vehicle. Other members of the task force were parked near that location conducting surveillance. Upon arrival at 110 Dexter Avenue, Lawlor, dressed as a FedEx delivery person, walked to the front door with the packages and knocked on the door. When no one answered, Lawlor left the packages and departed the scene. A man identified as Nelson Johnson subsequently drove into the driveway, briefly went inside the residence, and then came out and began to put the packages in his vehicle. At this point, members of the state police apprehended Johnson.

Johnson informed the police that he did not know what was in the packages but was delivering them for the defendant. The police asked Johnson to call the defendant and to tell him that he had to come to the residence to pick up the packages. Johnson complied, and the defendant told Johnson to put the packages

under the back porch of the residence. When the defendant arrived, he initially circled the neighborhood a few times and then got out of his car, placed an envelope in the mailbox, and knocked on the door. Two police detectives opened the door and ordered the defendant to put his hands up and get on the ground. When he did not comply with these orders, one of the detectives tasered the defendant, and he was taken into custody.

Once in custody, the defendant declined medical attention and, upon inquiry, claimed to have no knowledge of what was in the packages. The defendant indicated that he resided on the second floor of a residence located at 53 Sexton Street in New Britain. The defendant verbally consented to a search of that residence and signed a written consent form. The police then transported the defendant to Meriden police headquarters and proceeded to 53 Sexton Street in New Britain.

Upon arrival at 53 Sexton Street in New Britain, the defendant's mother-in-law consented to a search of the second floor but informed the police that the defendant lived on the first floor with his wife. While the police were searching the second floor, the defendant's wife came home and informed the police that she lived on the first floor of the residence and that the defendant lived in the basement. Patrick Joseph Torneo, a master sergeant with the statewide narcotics task force, then called George DelMastro, a sergeant with the Meriden Police Department, and asked him to clarify the consent given by the defendant. DelMastro spoke with the defendant, who indicated that he and his family lived on the first and second floors, and that there had been a fire on the third floor. The defendant indicated that he owned the residence and informed DelMastro that the police had his permission to search the whole house. DelMastro then called Torneo and communicated this consent to him. After receiving the call from DelMastro, the police searched the basement at 53 Sexton Street in New Britain and seized approximately $50,000 in cash, a Ruger .357 caliber revolver, ammunition, and digital scales and packaging material consistent with that used by drug dealers to weigh marijuana or other narcotics.

On the basis of the incident in Meriden, the defendant was charged with attempt to possess one kilogram or more of a cannabis-type substance with intent to sell by a person who is not drug-dependent in violation of §§ 53a-49 (a) (2) and 21a-278 (b), attempt to possess more than four ounces of a controlled substance in violation of General Statutes §§ 53a-49 and 21a-279 (b), and interfering with an officer in violation of General Statutes § 53a-167a (a). On the basis of the incident in New Britain, the defendant was charged with possession of drug paraphernalia in violation of General Statutes § 21a-267 and criminal possession of a revolver in violation of § 53a-217c. Prior to trial, the court granted

the state's motion for joinder of the Meriden and New Britain cases for trial. The state then filed a five count amended long form information that included both the Meriden and New Britain charges. Following trial, the defendant was convicted of attempt to possess one kilogram or more of a cannabis-type substance with intent to sell by a person who is not drug-dependent based on the Meriden charges and criminal possession of a revolver based on the New Britain charges.[3] The defendant then filed the present appeal.

I

The defendant first argues that the court abused its discretion by granting the state's motion for joinder of the Meriden and New Britain cases for trial and denying his motion for severance. We disagree.

The following additional facts are necessary for the resolution of this issue. On March 11, 2013, the state filed a motion for joinder of the Meriden and New Britain cases for trial. At a hearing on March 13, 2013, defense counsel indicated that he was not prepared to argue the joinder issue, as he had just received the motion that morning. He also questioned the lateness of the state's motion, in light of the fact that the Meriden case had been pending for approximately one year and the motion for joinder was filed on the eve of trial. In response, the prosecutor argued that the motion for joinder was timely as the defendant's motion for a speedy trial was filed on February 22, 2013. The prosecutor also indicated that the parties had previously discussed the issue of transferring the New Britain case to Meriden, but this had not occurred as the parties could not reach an agreement. The court proceeded to hear the merits of the motion for joinder, but indicated to defense counsel that it would entertain a motion for reconsideration should the defendant file such a motion.

Following argument on the merits, the court granted the motion for joinder. In doing so, the court noted that the state had the burden of proving that the defendant would not be substantially prejudiced by joinder. The court further noted that the potential for prejudice existed because a jury might consider a person charged with so many crimes to be a bad person, and further noted that a curative instruction might be necessary. The court found that the state's informations were of the same character and that certain evidence might be cross admissible. The court also considered the factors set forth in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), and ultimately concluded that the joinder of the cases did not constitute substantial prejudice to the defendant. Defense counsel immediately asked the court to reconsider its ruling, and the court indicated that it would give counsel until the following morning to research and argue the joinder issue.[4]

The next day, defense counsel indicated that although he had looked at *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012), and *State* v. *Boscarino*, supra, 204 Conn. 714, he had not been able to do extended research as he was suffering from a medical condition, and he, therefore, requested permission to withdraw his motion for a speedy trial. In response, the court noted that it had not "seen any evidence of any compromised acuity" on the part of defense counsel. The court noted that the defendant's arrests seemed to be "if not factually similar, factually identical, arising from the same transaction" and stated that it was "merely a matter of geography that one case was brought in New Britain and one case was brought in Meriden." The court further stated that "it certainly doesn't seem to be anything close to a close call on the issue of joinder. If [the defendant] lived in Meriden, there wouldn't be any motion for joinder. It would be the same transaction. And of course, they are clearly legally related." The court indicated that previously, in chambers, it had offered defense counsel another day to supply a memorandum of law on the joinder issue, but counsel had said that this was not enough time. The court ultimately gave defense counsel until March 19, 2013 to prepare a response or argument on the state's motion for joinder. In so ruling, the court noted that defense counsel had represented the defendant from the beginning in both cases and that the New Britain matter was also on the jury list. The court also indicated that defense counsel would have had notice that the state was going to seek to have the cases tried together in light of the state's prior requests to transfer the New Britain matter to Meriden.

On March 20, 2013, the court heard argument on the defendant's motion to reconsider joinder of the two cases. At that time, defense counsel argued that the state's motion for joinder was filed on the eve of trial, despite the fact that the cases had been pending for approximately eighteen months. He claimed that because of the joinder, the defendant was essentially being forced to testify in one of the cases when he had not planned to do so. Defense counsel also requested permission to proceed with a jury trial on the Meriden charges and a court trial on the New Britain charges. Following argument, the court stated that there was no substantial prejudice to the defendant as a result of the joinder of the cases. The court found that the offenses alleged were of the same character, and that they arose or were related to the same course of conduct. The court noted that it was the defendant's strategic decision whether to testify, and that it would issue a curative instruction if necessary. The court further found that the evidence in both cases would likely be cross admissible if the cases were tried separately, specifically noting that the evidence in the New Britain case would likely be admissible in the Meriden case regarding the

issue of intent. The court continued by noting that the allegations were not of a violent nature and did not concern brutal or shocking conduct by the defendant, and that the charges were factually and legally related. Finally, the court found that the defendant had sufficient notice of the state's desire for transfer or joinder. Accordingly, the court did not change its decision regarding joinder of the cases, and the cases proceeded to trial.[5]

On appeal, the defendant argues that the court abused its discretion by joining the Meriden and New Britain cases. Specifically, the defendant argues that his attorney was not given adequate notice of the motion for joinder, or an adequate opportunity to argue the motion and to prepare for trial. The defendant also argues that the offenses should not have been joined pursuant to *State* v. *Boscarino*, supra, 204 Conn. 714, and that the joinder resulted in substantial prejudice, impacting the essential fairness of his trial. The state argues in response that the defendant's claim is inadequately briefed and, therefore, is unreviewable. If it is reviewable, the state argues that the court properly permitted joinder because the evidence in the cases was cross admissible in separate trials. Alternatively, the state argues that the court properly concluded that joinder was appropriate after applying the *Boscarino* factors. We conclude that the defendant's claim is reviewable, but we agree with the state that the court properly joined the cases because the evidence in the cases would have been cross admissible in separate trials. In light of this conclusion, we need not reach the issue of whether the defendant has established the existence of any of the *Boscarino* factors.

We initially consider the defendant's claims regarding lack of notice and opportunity to argue the motion. In support of his claim, the defendant contends that the opportunities given to him to reargue the motion for joinder "were brief and illusory," and that the court's decision was "set in stone" well before defense counsel had an adequate opportunity to oppose the motion. The defendant further contends that joinder of the cases was not based on judicial economy but, rather, was "a weapon to negatively affect the defendant and his chance of prevailing." According to the defendant, in light of the context and circumstances surrounding the granting of the motion for joinder, as well as the sum of the evidence that resulted from the granting of the motion, he was prevented from receiving a fair trial. Our review of the record, however, belies the defendant's claims.

The motion for joinder was filed on March 11, 2013. The court granted the motion on March 13, 2013, but the court also told defense counsel that it would entertain a motion for reconsideration should the defendant file such a motion, and that it would "give [defense counsel]

every opportunity to more fully research and argue" the issue of joinder, and "to look at" the controlling case law. The court, therefore, gave the defendant until the following morning to research and argue the motion. The next day, when defense counsel indicated that he had not been able to do extended research due to ongoing medical issues, the court gave him until March 19, 2013, to prepare a response to the motion for joinder. Full argument on the merits of the motion to reconsider the granting of the motion for joinder did not take place until March 20, 2013. At the conclusion of the arguments, the court took a brief recess to review the controlling case law again before ruling. In light of the record, we cannot say that the court improperly joined the Meriden and New Britain cases without providing the defendant with sufficient notice and an opportunity to argue against joinder of these matters.

We turn now to the merits of the motion for joinder. Practice Book § 41-19 provides that "[t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together." "[I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Internal quotation marks omitted.) *State* v. *Crenshaw*, 313 Conn. 69, 83, 95 A.3d 1113 (2014). "[W]hen charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors." (Footnote omitted.) *State* v. *Payne*, supra, 303 Conn. 549–50. "On appeal, however, the burden shifts to the defendant to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury. . . . The defendant may establish that he was substantially prejudiced by showing either that the evidence would not have been cross admissible or that one or more of the *Boscarino* factors[6] were present." (Citation omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 83. "The argument for joinder is most persuasive when the offenses are based upon the same act or criminal transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 157, 51 A.3d 1048 (2012).

*State* v. *Whittingham*, 18 Conn. App. 406, 558 A.2d 1009 (1989), is instructive in the present cases. In *Whit-*

*tingham*, the police obtained a search warrant for the defendant's person and his van. Id., 408. After the police located the van in front of an apartment house, they noticed the defendant watching them from a nearby apartment. Id. The police asked the defendant to come down to the van, and, when he complied, the police noticed an odor of marijuana on his person. Id. The police found 1.16 ounces of marijuana in the van and arrested the defendant. Id. When the police went inside the apartment building to inform the defendant's girlfriend that the defendant was being taken into custody, one of the officers noticed the odor of marijuana wafting out of the defendant's apartment. Id., 408–409. The police returned to the apartment with a warrant two hours later and, in searching the apartment, discovered drug paraphernalia, a sawed-off shotgun and ammunition, a scale, and a locked briefcase containing an adding machine, $700 in small denominations, a department store receipt with the defendant's name and seventeen ounces of marijuana packaged for sale. Id., 409. The defendant was charged with possession of marijuana and possession of marijuana with intent to sell in connection with the evidence found in the van; the defendant was charged with possession of four or more ounces of marijuana, possession of drug paraphernalia, possession of a sawed-off shotgun, and possession of marijuana with intent to sell based on the evidence found in the apartment. Id. The informations were joined for trial, and, following trial, the defendant was convicted of possession of marijuana with intent to sell in connection with the van, and acquitted of all charges involving the apartment. Id.

In rejecting the defendant's challenge to the joinder of the informations, we stated that the offenses charged in the two informations arose from what was essentially a single transaction. Id., 411. Specifically, we stated that "contemporaneously with their search of the van, the police uncovered the first link in the chain of evidence leading to the search of the apartment, namely, that the defendant's odor of marijuana suggested that illegal activity was taking place in the apartment. Although the process of procuring a search warrant delayed the search of the apartment for several hours, the crimes were connected in time and place." Id., 411–12. Similarly, in the present cases, after the defendant was arrested following the controlled delivery of the marijuana in Meriden, he informed the police of his address in New Britain. The police then searched the defendant's home in New Britain and seized several items, including a handgun, ammunition, and digital scales and packaging material consistent with that used by drug dealers to weigh marijuana or other narcotics. The court specifically stated that the defendant's arrests seemed to be "if not factually similar, factually identical, arising from the same transaction," and that it was "merely a matter of geography that one case was

brought in New Britain and one case was brought in Meriden." On the basis of our review of the record, we agree with the trial court and conclude that the conduct giving rise to the charges arose from a single transaction. See *State* v. *Crenshaw*, supra, 313 Conn. 84 (joinder of two informations upheld where "the conduct giving rise to the charges . . . constituted a single, unbroken course of conduct").

In addition to finding that the cases were factually similar and arose out of the same transaction, the court noted that the evidence in the New Britain case would "very likely be admissible in the Meriden case, as intent. It's a state of mind issue . . . to be inferred from conduct and circumstantial evidence. That circumstantial evidence may likely come from what is alleged to have been seized in New Britain." We agree.[7]

We initially note that "[b]ecause of its prejudicial impact, evidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts. . . . On the other hand, such evidence may be offered in proof of an issue in the case, such as intent, identity, malice, motive or a system of criminal activity." (Internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 313 Conn. 86–87. We further note that the element of intent to sell marijuana may be proved by circumstantial evidence. See *State* v. *Avila*, 166 Conn. 569, 576–77, 580, 353 A.2d 776 (1974); *State* v. *Whittingham*, supra, 18 Conn. App. 412.

In addition to holding that the offenses arose from a single transaction in *State* v. *Whittingham*, supra, 18 Conn. App. 412–13, we also held that the two informations were legally related, and that the seventeen ounces of marijuana found in the briefcase that was seized in the apartment was admissible in the van case with regard to the issue of intent. Specifically, we stated: "In light of testimony by the state's expert that drug dealers routinely keep most of their inventory separate from the smaller amount that they possess for sale on the street, the evidence of the seventeen ounce quantity was relevant to the issue of whether the defendant intended to sell the 1.6 ounces of marijuana found in the van. . . . Thus, the evidence of the seventeen ounces of marijuana in the briefcase was admissible in the van case." (Citations omitted.) Id., 412–13. In the present cases, Christopher McWilliams, a sergeant with the Connecticut state police, testified that most people involved in narcotics trafficking do not keep money, drugs, and guns in the same location; these items, rather, are placed in different locations. Torneo testified that marijuana dealers often have large sums of money, and that drug dealers are known to carry and possess weapons or pistols for their own protection. He also testified that scales and packaging material are indicative of someone who sells drugs. The items seized in New Britain, therefore, would have been relevant and

admissible as circumstantial evidence regarding the defendant's intent to sell the marijuana that was seized in Meriden.[8] See *State* v. *Avila*, supra, 166 Conn. 580 ("fact that a gun was . . . found with the heroin was relevant to the issue of intent to sell"); *State* v. *Legnani*, 109 Conn. App. 399, 424, 951 A.2d 674 (upholding joinder when significant portion of evidence seized from defendant's home, including firearms and ammunition, leading to charges in second case, would have been admissible in first case charging defendant with, inter alia, assault in first degree), cert. denied, 289 Conn. 940, 959 A.2d 1007 (2008); *State* v. *Garcia*, 108 Conn. App. 533, 539, 949 A.2d 499 ("quantity of money seized from [a] defendant [is] relevant to the issue of intent to sell cocaine" [internal quotation marks omitted]), cert. denied, 289 Conn. 916, 957 A.2d 880 (2008); *State* v. *Whittingham*, supra, 18 Conn. App. 412–13 (seventeen ounces of marijuana found in apartment relevant to whether defendant intended to sell lesser amount found in van).

"[When] evidence of one incident can be admitted at the trial of the other [incident], separate trials would provide the defendant [with] no significant benefit. . . . [U]nder such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, [w]e consistently have found joinder to be proper if we have concluded that the evidence of other crimes or uncharged misconduct would have been cross admissible at separate trials. . . . [When] evidence is cross admissible, therefore, our inquiry ends." (Citation omitted; internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 313 Conn. 83–84; see also *State* v. *Vere C.*, 152 Conn. App. 486, 521, 98 A.3d 884, cert. denied, 314 Conn. 944, 102 A.3d 1116 (2014). In the present case, because the evidence would have been cross admissible in separate trials, the court did not abuse its discretion in granting the state's motion for joinder.[9]

## II

The defendant next argues that the court erred in denying his motion to suppress the evidence obtained by the police as a result of the warrantless search of his home. We disagree.

The following additional facts are necessary for the resolution of this claim. Prior to trial, the defendant filed a motion to suppress all tangible evidence taken from his home at 53 Sexton Street in New Britain. Following a hearing on the motion, the court found that the defendant told DelMastro that he owned the entire property located at 53 Sexton Street in New Britain and gave his verbal consent to the police to search the entire property, including the basement area. On appeal, the defendant challenges the court's finding with regard to the consent to search the basement, and argues that there was no testimony or other evidence in the record

that draws particular attention to the basement area of the home. We disagree and conclude that the court's factual finding with regard to consent is supported by the evidence in the record.

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." (Internal quotation marks omitted.) *State* v. *Mullien*, 140 Conn. App. 299, 306, 58 A.3d 383 (2013). "It is axiomatic that searches and seizures inside a home without a search warrant are presumptively unreasonable. . . . A warrantless search or entry into a house is not unreasonable, however, under the fourth amendment to the United States constitution or article first, § 7, of the Connecticut constitution when a person with authority to do so has freely consented. . . . The question of whether a defendant has given voluntary consent to enter or search his or her premises is a question of fact to be determined by the trial court by considering the totality of the circumstances surrounding the entry or search." (Internal quotation marks omitted.) Id., 305–306. "Whether there was valid consent to search is a factual question that will not be lightly overturned on appeal." (Internal quotation marks omitted.) *State* v. *Cobb*, 251 Conn. 285, 314, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

"The standard for measuring the scope of a suspect's consent under the [f]ourth [a]mendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect? . . . The scope of a search is generally defined by its expressed object. . . . Although objective reasonableness is a question of law [over which our review is plenary], the factual circumstances are highly relevant when determining what a reasonable person would have believed to be the outer bounds of the consent that was given." (Citations omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 255, 3 A.3d 806 (2010).

Application of these principles to the facts of this case leads us to conclude that the court properly found that the defendant voluntarily consented to a search of his residence, including the basement. On March 26, 2013, at a hearing on the motion to suppress, Lawlor testified that after the defendant was taken into custody in Meriden, he told the police that he lived on the second floor at 53 Sexton Street in New Britain, and consented to a search of that residence. Lawlor further testified that the defendant executed a consent form for the search.[10] According to Lawlor, upon arrival at 53 Sexton Street, the defendant's mother-in-law informed the

police that the defendant lived on the first floor with his wife. The defendant's wife, however, informed the police that she and the defendant were having marital issues, and that the defendant would either sleep on the couch in the first floor residence, or in the basement. Torneo testified that he was concerned that the defendant had attempted to trick the police into believing that he lived on the second floor, so he called DelMastro at the Meriden Police Department and asked him to clarify that the defendant's consent for the search included the entire residence. Torneo further testified that once DelMastro called him back, the police searched the basement. DelMastro testified that after receiving the call from Torneo, he asked the defendant if the police had permission to search the entire residence in New Britain, and the defendant said that they did.[11] DelMastro further testified that after he had this conversation with the defendant, he called Torneo back and told him what the defendant had said, specifically "that he owned the residence, and they had his permission to search the residence."

The defendant also testified at the suppression hearing. On cross-examination, he stated that when DelMastro asked for his consent to search the house, he did not consent. The court then admitted DelMastro's police report into evidence as a prior inconsistent statement of the defendant. The report indicates that the defendant had consented to a search of the whole house.[12]

On March 27, 2013, prior to the commencement of evidence, the court issued an oral ruling on the motion to suppress.[13] In its decision, the court stated that "the defendant indicated to Sergeant DelMastro that he owned the entire New Britain property and gave his verbal consent for law enforcement to search the entire New Britain property to include the basement area." The court also credited the testimony of DelMastro, with regard to consent, and did not credit the defendant's contrary testimony. Finally, the court found that the search of the basement area was within the scope of the consent given by the defendant to DelMastro.

On the basis of our review of the record, we cannot say that the court's factual finding that the defendant consented to the search the entire residence, including the basement, was clearly erroneous. When the police were unsure regarding the scope of the defendant's consent, Torneo asked DelMastro to obtain clarification from the defendant. DelMastro testified that he asked the defendant if the police had his permission to search *the entire residence*, and the defendant consented. Similarly, DelMastro's police report indicated that the defendant was very clear when he gave the police permission "to search *his whole house*." (Emphasis added.) The court acted within its authority to credit the testimony of DelMastro that the defendant consented to a search of the entire house, and reasonably concluded that the

entire house included the basement. See *State* v. *DeMarco*, 311 Conn. 510, 522–23, 88 A.3d 491 (2014) ("A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." [Internal quotation marks omitted.]). Accordingly, the defendant cannot prevail on his claim that the trial court improperly denied his motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The packages were selected for inspection based on certain criteria, such as the weight distribution and origin of the packages, as well as how they were taped and labeled.

[2] One of the packages contained 9.32 pounds of marijuana, and the other contained 10.3 pounds of marijuana.

[3] With regard to the Meriden charges, the defendant was also convicted of attempt to possess more than four ounces of a controlled substance in violation of §§ 53a-49 and 21a-279. The court vacated that conviction in accordance with *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013). The defendant was acquitted of the charge of interfering with a police officer in violation of § 53a-167a (a). With regard to the New Britain charges, the jury could not reach a unanimous verdict on the charge of possession of drug paraphernalia. The state nolled that charge, and the court thereafter dismissed it.

[4] The court stated: "Alright, as I have indicated, I will give you every opportunity to more fully research and argue, although you have done a fairly good job without being prepared according to your representations, on the motion for joinder, to do the appropriate research, to look at [*State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012)] and [*State* v. *Boscarino*, supra, 204 Conn. 714], to put something in writing, if you choose to. And to reargue that tomorrow morning."

[5] The court also denied the defendant's oral motion to elect a court trial on the New Britain charges.

[6] "When evidence is not cross admissible, several factors identified in . . . *Boscarino* . . . are used to determine whether the defendant has suffered substantial prejudice. These factors include: (1) whether the charges involve discreet, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 313 Conn. 83–84 n.8.

[7] Although the defendant states in his appellate brief that the offenses should not have been joined pursuant to *Boscarino*, he does not address whether the evidence would have been cross admissible in separate trials. We note, however, that "[when] evidence is cross admissible . . . our inquiry ends." (Internal quotation marks omitted.) *State* v. *Crenshaw*, supra, 313 Conn. 84.

[8] We also agree with the state that evidence regarding the controlled delivery in Meriden would have been admissible in the New Britain case to prove that the digital scales and packaging materials were drug paraphernalia and not, as the defendant's wife and sister-in-law testified, items used in a trinkets business.

[9] In light of this conclusion, we need not reach the issue of whether any of the *Boscarino* factors exist. See *State* v. *Crenshaw*, supra, 313 Conn. 82 n.6; *State* v. *Vere C.*, supra, 152 Conn. App. 521.

[10] Lawlor also testified that he subsequently lost the signed consent form.

[11] At the suppression hearing, DelMastro testified as follows:

"Q. And what was the nature of your conversation with [the defendant]?

"A. I was asking him if the [state police] and the officers in that unit

would have permission to search the residence he owned in New Britain.

"Q. Okay. And how—what did [the defendant] respond to you?

"A. Yes. I don't know the exact wording, but it was, he owned the house and they had permission to search the whole house. And—um—I don't even know the address at this time. I know it was in New Britain.

"Q. And did you specifically ask [the defendant] if the statewide narcotics task force had permission to search the entire residence?

"A. Yes.

"Q. And what did [the defendant] say?

"A. Yes. I wrote a report on that.

"Q. Would you say that [the defendant] was very clear in his response to you?

"A. Yes."

[12] DelMastro's police report stated in relevant part: "On 6/10/11 at about 1830 Hrs. I received a call from CSP Sgt. Torneo who is a member of the Statewide Narcotics Unit. Sgt. Torneo stated that his unit had consent from [the defendant] to search the 2nd Floor of his residence in New Britain, CT. Sgt. Torneo asked me if I could ask [the defendant] if he would give consent to search the rest of his residence in New Britain, CT. I went back to cell #9 and spoke with [the defendant] concerning this. I asked him if the officers he was dealing with had consent to search the rest of his house. [The defendant] stated that he owned the house in New Britain and he would give them consent to search the whole house. [The defendant] stated that he lived on the first and second floor with his family and his mother or mother in law. I'm not sure which one he said, lived with his immediate family. [The defendant] stated that the third floor was vacant and that he has to do work to that apartment due to a fire, but they could search that also. [The defendant] was very clear when he said he gave permission to search his whole house. I told [the defendant] I was going to let the officers know. I called Sgt. Torneo and told him what [the defendant] had told me concerning the consent to search at his residence."

[13] The court later issued a written memorandum of decision.